LOS ANGELES GAS & ELECTRIC CORP. *v.* RAILROAD COMMISSION OF CALIFORNIA ET AL.

No. 412. Argued February 7, 8, 1933.—Decided May 8, 1933

288

*Mr. Herman Phleger,* with whom *Messrs. Paul Overton, Maurice E. Harrison,* and *James S. Moore, Jr.,* were on the brief, for appellant.

*Mr. Arthur T. George* for appellees.

*Mr. Frederick von Schrader,* with whom *Messrs. Erwin P. Werner* and *William H. Neal* were on the brief, for the City of Los Angeles, intervener.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

The Los Angeles Gas & Electric Corporation assails as confiscatory the gas rates fixed by an order of the California Railroad Commission in November, 1930, effective January 1, 1931. 35 C.R.C. 442. The District Court,

of three judges, granted an interlocutory injunction and on final hearing dismissed the bill. 58 F. (2d) 256. The Company appeals.

The Company, organized in 1909, supplies both gas and electric current. Its rates for the latter are not in controversy. The two departments, both with respect to investment and operation, are distinct and have been separately treated for rate-making purposes for many years. From 1913, when natural gas in substantial quantities was first made available in Los Angeles, until 1927, the Company distributed a mixture of natural and manufactured gas, and since 1927 straight natural gas has been distributed. The Company's service extends over the greater part of Los Angeles and neighboring cities and unincorporated territory. It has over 2,900 miles of mains and 385,000 meters. From 1917 the Company's gas rates have been fixed by the California Railroad Commission. Rate orders were made in 1917, 1919, 1921, 1923, 1926 and 1928. During this period the Company's business greatly increased. The rate base for its gas department, as fixed by the Commission, grew from approximately $12,500,000 in 1916 to about $59,000,000 in 1929. The growth was financed by the sale of the Company's bonds and preferred stock. These, according to the finding of the Commission, had been marketed at a gradually lessening cost so that, at the time of the hearing which resulted in the order under review, it was found that the "annual cost of its bond and preferred stock money" was 6.17 per cent. Approximately 60 per cent. of the amounts thus realized is chargeable to the gas department.[1]

---

[1] Reviewing the financial history of the Company, the Commission found: "On December 31, 1929, the Company had outstanding in the hands of the public $47,070,000 par value of bonds, $19,469,995 par value preferred stock, and $20,000,000 par value of common stock. Its depreciation reserve on that date was reported at $16,804,105.15. All of its common stock is owned by Pacific Lighting Corporation. Since 1916 but $4,500,000 of this stock has been purchased for cash,

Under the Commission's order of 1928, the gas rates were estimated to yield a return slightly in excess of 7.5 per cent. 32 C.R.C. 379, 386. Concluding that these rates actually yielded a much higher return, the Commission reduced the rates by the order now under review. It was intended to effect a reduction of 9 per cent. in gross revenue. 35 C.R.C., pp. 463, 469. The reduction amounted to about $1,300,000 in gross revenue and about $1,080,000 in net revenue.

■ *The Commission's valuations.* In determining the rate base, the Commission made two sorts of valuations of the gas properties for the year 1930,—one of $60,704,000 on the basis of "historical cost," and the other of $65,500,000 on the basis of "fair value." The Commission estimated that the return to the Company on the former basis would be 7.7 per cent. and, on the latter, 7 per cent. 35 C.R.C., p. 464.

*Historical cost.* The finding as to historical cost had relation to the method previously adopted by the Commission in the regulation of the Company's rates. The original rate base was established by the Commission in 1917 upon a valuation made by the Commission's engineers as of October, 1915. 13 C.R.C. 724. In the later rate proceedings, including the one now under review, the

---

$5,500,000, however, having been distributed to Pacific Lighting Corporation in the form of stock dividends, representing earnings left in the property. Dividends have been paid on its common stock of 7.20 per cent. per share ($100 par value) in 1916, 1917 and 1918; 7.4 per cent. in 1919; 8.4 per cent. in 1920, 1921 and 1922; 8.7 per cent. in 1923; 33.75 per cent. in 1924, included in which is 25 per cent. as a stock dividend of $2,500,000; 9 per cent. in 1925; 9.815 per cent. in 1926; 35.17 per cent. in 1927, which includes a stock dividend of 21.42 per cent., or $3,000,000; 15 per cent. in 1928, and 17 per cent. in 1929. The Company's surplus has grown from $381,212.97 in 1916 to $4,176,663.09 in 1929, while its depreciation reserve increased from $3,804,383.36 to, as said above, $16,804,105.15." 35 C.R.C., pp. 447, 448.

historical cost was built upon the value established in 1917 augmented by net additions and betterments as entered upon the Company's books, but with land at current values.[2] Of the total amount fixed by the Commission on the basis of historical cost, the sum of $1,862,103 was for materials and supplies, working capital and estimated net additions and betterments for 1930, leaving $58,842,187 as the historical cost of the fixed property at the end of 1929. Aside from overheads, the estimates made by the Company and by the Commission of the historical cost of this property did not differ widely.[3] The main difference lay in the treatment of overheads in the book entries of additions and betterments from 1916 to 1929; the Company contends that the amounts recorded in its books in respect to indirect construction costs were inadequate. The reference is to the amounts which should

[2] See 16 C.R.C. 478, 482; 20 *id.* 93, 96; 29 *id.* 164, 181; 32 *id.* 379, 381.

[3] The Commission found: "Estimates of the historical cost of the structural property were made in this proceeding, both by the Company and by the Commission's Valuation Department. Excluding overheads, the Company reached a figure approximately $300,000 higher than the one obtained by taking the 1917 rate base as fixed by the Commission in its first decision and building up on that, while the Valuation Department of the Commission reached a figure approximately $300,000 lower than the one thus obtained. The fact that each of these estimates, independently reached by employing somewhat different methods and procedure, corresponded so closely to the historical cost figure as used and accepted by the Commission and by the Company as correct in the series of rate determinations running from 1917 to 1928, confirms its substantial accuracy. The figure used conforms to the accounting practice of the Company as to the bulk of its investment, which has increased from approximately $13,000,000 in 1917 to over $58,000,000 in 1929, the difference representing net additions and betterments during this period as inscribed in the Company's books and records. Mr. McAuliffe [the Commission's appraiser] and the Company's land appraiser were surprisingly close in their results. In the few points of difference Mr. McAuliffe's testimony was the more convincing." 35 C.R.C., p. 451.

be included for engineering and superintendence, legal expenses, injuries and damages, insurance, taxes, interest during construction and contingencies. The general instructions of the Commission as to classification of fixed capital accounts provided that such overheads should be assigned or apportioned to particular accounts so that each item of property should bear its proper share, and a considerable range of discretion in making allocations rested with the Company. 35 C.R.C., p. 451. The Company had availed itself of this opportunity and the average charge on the Company's books for these costs from 1913 to 1929 was about 6 per cent. of the direct labor and material charges. The Commission's engineers were of the opinion that 11.25 per cent. might reasonably have been charged to capital and, on that basis, the total historical cost of fixed property would have been raised from $58,842,187 to $61,019,662. The Company's engineers estimated that 14.48 per cent. should be allowed for these overheads, bringing that historical cost up to $63,413,246. The Commission stated that its conclusions had been reached upon the assumption that the Company's allocations in reporting additions and betterments were properly made, and that the effect of the long-continued practice of the Company was that it had been allowed under the rate orders, in the form of operating expenses, the items which it now claims should have been added to capital. The Commission thought that the Company was not in a position to raise the question. The Commission recognized an exception in the item of interest during construction which, when not charged to capital, had been charged to income accounts and did not go into operating expenses, and accordingly there was included in the Commission's finding of historical cost an additional allowance, for that interest, of $155,000 which the Commission deemed to be fair. 35 C.R.C. 451–453.

No deduction was made from the total historical cost for the investment in the generating plant and equipment which the Commission found were being rendered unnecessary by the introduction of natural gas. In order to meet the rapidly increasing demand, the gas manufacturing plant had been greatly expanded until in 1924 the Company had a plant of 98,500,000 cubic feet daily capacity. The book value of this plant was approximately $10,000,000 and the amount included therefor in the Company's estimate of historical cost was approximately $10,500,000. Since April, 1927, on account of the supply of natural gas, the Company has not manufactured gas except on one occasion, on March 13, 1928, when, in anticipation of a shortage, a certain amount (569,000 cubic feet) was manufactured which constituted but nine-tenths of one per cent. of the gas sent out on that day. The Commission found that the evidence convincingly established " the existence of a natural gas supply adequate for years to come." But as the investment in the manufacturing plant had been made prudently and in good faith, it was included by the Commission in the estimate of the historical cost of the Company's gas properties.

In that estimate, as thus made, nothing was deducted for depreciation and nothing was added for going concern value.

*Fair value.* The Company claimed before the Commission a rate base of approximately $95,000,000 on the basis of reproduction cost new as of January 1, 1930, less accrued depreciation. 35 C.R.C., p. 456. On comparing the Company's estimate as of that date with the estimate of the Commission's engineer of reproduction cost new (of December 31, 1929), in each case without deduction for depreciation, it appears that the difference, exclusive of overheads and the items mentioned below, was only about

$3,000,000 in the valuation of the physical property.[4]  In its estimate the Company included overheads at 24.27 per cent., or a total of $14,990,278.  On that basis, the value of the physical property was estimated by the Company, without depreciation, at $76,754,919.[5]  This included $12,134,665 as the "reproduction value of the standby manufacturing facilities," above mentioned. The Company's witness testified before the Commission (in 1930)[6] that in his estimate of reproduction cost he had "attempted to obtain prices that would be reasonably stable and might prevail over the next three years"; that the prices used were "very close to the average of those which prevailed for a 3-year period prior to January 1, 1930"; and while in his opinion there was "a temporary slump in prices," he did not think it probable that there would be "any substantial change within the next two or three years."

The estimate of the Commission's engineer for reproduction cost new of the same physical property including the gas manufacturing plant, as of December 31, 1929, without depreciation, taking unit prices of that day and overheads at 21.65 per cent., was $72,471,207.  As of the same date, but using four-year average unit prices for the years 1926 to 1929, his estimate was $73,210,136, with overheads taken at 22.32 per cent.[7]  His estimates on the

[4] The amount, exclusive of overheads, thus reached by the Company was $62,596,422, and by the Commission's engineer $59,413,008.

[5] This is the total of Items 2, 3 and 4 of the Company's valuation of physical property, as shown in the Company's exhibit and set forth in the Commission's findings.  35 C.R.C., p. 456.  This amount, with Item 1 ($831,781) for "organization and franchises" make up the total of $77,586,700 claimed by the Company as the reproduction cost new of its fixed property.

[6] The hearing before the Commission was completed on July 16, 1930, and its order was made on November 24, 1930.

[7] This amount, with $427,406 allowed by the Commission's engineer for "organization and franchises" makes the total of $73,637,542 as

last mentioned basis, but with overheads at 6 per cent. and 11.25 per cent., respectively, were $64,082,282 and $67,007,-569.[8] With unit prices as of June 15, 1930, his estimates for reproduction cost new as of that day, without depreciation, and with overheads at 6 per cent., 11.25 per cent., and 21.64 per cent., respectively, were $63,399,822, $66,-291,307 and $72,040,522.[9]

In arriving at its total estimate of reproduction cost new, the Company added to its valuation of its physical property the items of " Cost of financing, $5,921,470," " Promoters' remuneration, $2,500,000," and " Going concern value, $9,228,667." These items the Commission did not allow. The items of " cost of financing " and " promoters' profits " were rejected as " too hypothetical and far removed from actuality to properly find lodgment in a rate base." The Company's claim for " going concern " value was based upon expert testimony which the Commission regarded as involving unacceptable theories and assumptions. 35 C.R.C., pp. 459, 460.

*Depreciation.* The Company estimated $3,470,326 for accrued depreciation. The Commission found that this was too little and that the accrued depreciation was not less than $7,650,000. The Commission stated that this amount was reached after a careful and detailed study involving a physical inspection of the property and analysis of the Company's records. *Id.,* p. 461.

*Commission's conclusion as to fair value.* The Commission's final conclusion was as follows: " Subject to deduction for accrued and realized depreciation in a sum of approximately $7,650,000, the fair value of the property

the reproduction cost new of the fixed property which was covered by the Company's estimate of $77,586,700.

[8] Adding the item of $427,406 (see Note 6), these estimates were $64,509,688 and $67,434,975, as shown by the Commission's exhibit.

[9] Or, with the addition of $427,406 (see Note 6), these estimates were $63,827,228, $66,718,713 and $72,467,928.

here involved as a going property with business attached, giving full effect to the current level of prices and allowing for any intangible elements of value not fully cared for in the usual and current operating expense allowances but excluding various built up claims of value incident to a reproduction of the property under an assumed reconstruction program as too uncertain and hypothetical to enter into a rate base figure, did not for the year 1928, using round figures, exceed $62,500,000, and for the year 1929 $64,000,000, and for the year 1930 does not exceed $65,500,000, which figures, for the purposes hereof, are spoken of as rate base." These amounts included the allowances (*supra,* p. 293) for additions and betterments (for 1930) and for working capital, materials and supplies. *Id.,* pp. 461, 462.

Although the accrued depreciation was thus treated by the Commission as deductible, in order to arrive at fair value, the Commission thought that operating results under the fair value theory could best be shown by using an undepreciated rate base. The result is that the Commission allowed for the year 1930, as a basis for its calculation of return, a valuation of $65,500,000 without deduction for depreciation. *Id.,* p. 462.

■ *The Commission's estimate of return.* Based upon assumed revenue and operating expenses, and with allowance for a depreciation annuity and taxes, the Commission estimated that the Company would earn a net return of 7 per cent. upon this undepreciated rate base. The Commission stated that the year 1930 was " in many respects an abnormal year "; that the temperatures had been higher than normal, and that the business depression had had an adverse effect upon the Company's growth and revenue. Still it was found that the Company's business was growing and that with growth there was a tendency for the rate of return to increase. The Commission rested

its conclusions " on the assumption that temperature conditions in the future will be normal and that business conditions will approximate those of the year 1930 and that the gross revenue of 1931 with normal temperatures will not be less than that of 1930." The Commission recognized that the revenue for 1930 might be less than that estimated and, on the other hand, that the operating expenses for that year were not at a normal figure. It was thought that " any diminution in revenue is offset by the amount by which operating expense is out of normal." But the Commission clearly perceived that " the *actual* earning position of the Company in the year 1931 " might be " either worse or better than it would be were these assumptions realized." It was thought that the disturbing element of varying temperatures might be guarded against by the establishment of a temperature reserve. The Commission pointed out that the depreciation reserve of the gas department, on December 31, 1929, was $9,350,689, which was " substantially in excess of the amount of accrued depreciation." The annual amounts which had been allowed for depreciation expense had proved to be larger than necessary, and it was suggested that a considerable part of the depreciation reserve might be transferred to a temperature reserve. While, for the present purpose, the Commission assumed that the creation of such a reserve was a matter of company policy, its desirability was emphasized. The Commission's order of November 24, 1930, establishing the rates here in question, provided for the acceptance at the Company's option of an alternative plan. This gave, in lieu of the rates prescribed, a provisional schedule of rates to be charged in 1931, and until the further order of the Commission, which was deemed to involve a reduction in revenue of approximately 7 per cent., instead of 9 per cent. as otherwise contemplated, the Company to agree to establish

a temperature reserve to which should be credited the amount by which the net earnings of its gas department for the year 1931 should be in excess of a stated sum. This plan was not accepted.

■ *Decision of the District Court.* The Company brought this suit in December, 1930, attacking the findings of the Commission as to both rate base and return. The Company alleged that the fair value of its gas properties exceeded $95,000,000, that its gross and net revenues were overestimated by the Commission, that under the rates prescribed the Company would have earned, for the twelve months ending October 31, 1930, but 4.25 per cent. upon the fair value which it claimed, and that the temporary optional rates, for which the Commission's order provided, would also yield less than a fair return and were equally invalid. Upon the motion for interlocutory injunction, the entire record before the Commission was received in evidence together with additional affidavits, and upon the same evidence the parties submitted the cause for final determination.

While the District Court did not make specific findings of values, revenue, expense and rate of return, the Court reviewed the findings of the Commission and the evidence and held that the Commission's valuations were reasonable and that the prescribed rates permitted a reasonable return. Two opinions were delivered, one for the majority of the Court and a concurring opinion by the Circuit Judge, in which the contentions of the Company were examined.

Considering the growth and stable position of the Company, the Court pointed out that " with a history of successful and profitable business, and no real competition to meet in its field of service, the hazard is small and the probabilities of continued demand assured. Electricity has not to any great extent supplanted gas as a fuel. All of the conditions noted, as affecting the business of the

Company, sustained the Commission in its statement that the plaintiff's securities are capable of be.ag marketed at moderate interest rates, and that it will continue to grow." 58 F. (2d) p. 259. The Court found that the Commission "was very liberal in its treatment of certain items of property"; that "since 1924" the Company has served natural gas, "which is plentiful in the numerous oil fields in southern California"; that "there is no evidence which destroys the Commission's conclusion that the supply of natural gas will be abundant and constant"; that the Commission had found in effect that "at least two of the artificial gas manufacturing plants" were no longer needed and might well be retired; that nevertheless the Commission had included them in its valuation "as a live necessary part of the operative property"; and that, had these plants been eliminated, "the fair value base would have been reduced by approximately $3,000,000." *Id.*

In the evidence produced on the application for interlocutory injunction was an affidavit of the Commission's engineer who brought the valuation of the Company's properties down to December 15, 1930, by applying the unit prices prevailing on that date. This witness, Mr. Dufour, who had been employed from 1915 to 1921 by the Interstate Commerce Commission, and from that time had served with the California Commission, stated that "he kept in close touch with the prevailing labor and material costs," maintaining as part of the valuation division of the Commission a cost bureau for that purpose; that "the present [December, 1930] trend of material and labor cost is downward; due to the present acute unemployment situation the wages paid the class of labor required for this type of construction is now lower and due to the large number of applicants for employment from which capable men may be selected the efficiency of labor is higher, tending to materially decrease the labor costs";

that he estimated " that the current price level cost of plaintiff's' gas properties used and useful in the public service applying prices prevailing December 15, 1930, including land market value as of December 31, 1929, and excluding difficulty factor,[10] is $60,009,099, undepreciated "; that this amount would represent the cost of the properties as they existed December 31, 1929, if the unit costs and prices prevailing on December 15, 1930, were used, applying overhead charges of six per cent." The Company's expert witness, in replying to this affidavit, gave his opinion that " the variations in price levels during the year 1930 do not constitute a permanent change in price levels and prices will for a reasonable period in the future be on a higher level than existed on December 15, 1930, and will, on the average over the next few years, approximate the prices used by him in his estimate of labor cost new reflected in the value of $95,767,351 shown in the affidavit filed herein on December 23, 1930."

Summing up its conclusions as to the action of the Commission, the Court said: " What the Commission did then in reaching its base rate figure of fair value was to include all items of property used and useful in the operative plant of the plaintiff, and appraise the value thereof at current market prices. It included original organization costs and franchise values as well. It assumed a live active plant, and affirmed that the ultimate total included all costs of attaching business as the same had accrued and been accounted for. Its fair value figure, assuming the correct estimate and allocation of

---

[10] The " difficulty factor," which had been estimated at $615,007, was stated by the witness to represent his estimate " of the increased labor costs that would be experienced in constructing the property under present physical conditions over those originally encountered, such as increased traffic difficulties and increased subterranean obstructions."

items hereinafter referred to, was one which essentially represented the investment cost, at the present time, of all the operative property and its connected incidentals." 58 F. (2d) p. 260. The Court regarded the ruling of the Commission in taking overheads in accordance with the Company's accounting practice as reasonable. The Court held that "the large amounts claimed by the Company for cost of financing, $5,921,470; promoters' remuneration, $2,500,000; cost of attaching business (going concern value), $9,228,667; added 'difficulty' costs, $580,-195, were properly rejected as for their total amounts." *Id.*, p. 262.

The Court observed that the matter of accrued depreciation, which had not been deducted from the fair value base as used by the Commission, was important as affecting the annuity allowance to be considered in arriving at prospective income. The amount allowed by the Commission as depreciation annuity was $1,072,000, while the Company claimed that it should be not less than $2,344,-744. The Court noted the inconsistency of this claim, when the Company asserted that the total accrued depreciation affecting its property was only $3,470,326. The Court concluded that the allowances for depreciation annuities which had been made prior to the rate hearing under review were excessive and were not controlling; that depreciation was a matter not capable of definite ascertainment and that it had not been shown that the Commission had not exercised a reasonable judgment. *Id.*, p. 261.

With respect to estimated income for the future, the Court referred to the Company's complaint that the two preceding years had been marked by unusually high temperatures and consequent diminished demand for gas, and that " it was improper to assume average temperatures." But the Court, familiar with conditions in Los

Angeles, thought that the practice adopted by the Commission was fair, adding: " We may note that the winter of 1931–32 in the city of Los Angeles, as it has thus far progressed at the end of January, has been one of the coldest in many years. And so, the rule of assumed average temperatures seems to be the only reasonable one to adopt. During unusually mild winters the utility service will earn less than was estimated to be allowed to it, and in colder winters will earn more." *Id.,* p. 262.

The action of the Commission was also approved with respect to the allowances for materials and supplies and for working capital.

In the final decree the Court set forth its finding " that the values for plaintiff's property as fixed and determined by the defendant Railroad Commission are the reasonable values thereof; that the rates fixed are such as to render a reasonable return on such values and that said rates are therefore not confiscatory," and the Court adopted, " as representing its further findings," the opinion filed by the two District Judges. The Circuit Judge concurred in the decree, referring to his concurring opinion for the findings of fact upon which his action was based.

We approach the decision of the particular questions thus presented in the light of the general principles this Court has frequently declared. We have emphasized the distinctive function of the Court. We do not sit as a board of revision, but to enforce constitutional rights. *San Diego Land & Town Co.* v. *Jasper,* 189 U.S. 439, 446. The legislative discretion implied in the rate making power necessarily extends to the entire legislative process, embracing the method used in reaching the legislative determination as well as that determination itself. We are not concerned with either, so long as constitutional limitations are not transgressed. When the legislative method is disclosed, it may have a definite bearing upon the valid-

ity of the result reached, but the judicial function does not go beyond the decision of the constitutional question. That question is whether the rates as fixed are confiscatory. And upon that question the complainant has the burden of proof and the Court may not interfere with the exercise of the State's authority unless confiscation is clearly established.

As the property remains in the ownership of the complainant, the question is whether the complainant has been deprived of a fair return for the service rendered to the public in the use of the property. This Court has repeatedly held that the basis of calculation is the fair value of the property, that is, that what the complainant is entitled to demand, in order that it may have " just compensation," is " a fair return upon the reasonable value of the property at the time it is being used for the public." [11] In determining that basis, the criteria at hand for ascertaining market value, or what is called exchange value, are not commonly available. The property is not ordinarily the subject of barter and sale and, when rates themselves are in dispute, earnings produced by rates do not afford a standard for decision. The value of the property, or rate base, must be determined under these inescapable limitations. And mindful of its distinctive function in the enforcement of constitutional rights, the Court has refused to be bound by any artificial rule or formula which changed conditions might upset. We have said

[11] See *Smyth* v. *Ames,* 169 U.S. 466, 547; *San Diego Land & Town Co.* v. *National City,* 174 U.S. 739, 757; *Willcox* v. *Consolidated Gas Co.,* 212 U.S. 19, 41; *Minnesota Rate Cases,* 230 U.S. 352, 434; *Southwestern Bell Telephone Co.* v. *Public Service Commission,* 262 U.S. 276, 287; *Georgia Railway & Power Co.* v. *Railroad Commission,* 262 U.S. 625, 631; *Bluefield Water Works Co.* v. *Public Service Commission,* 262 U.S. 679, 690; *Board of Commissioners* v. *New York Telephone Co.,* 271 U.S. 23, 31; *McCardle* v. *Indianapolis Water Co.,* 272 U.S. 400, 410; *St. Louis & O'Fallon Ry. Co.* v. *United States,* 279 U.S. 461, 484, 485.

that the judicial ascertainment of value for the purpose of deciding whether rates are confiscatory " is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts." *Minnesota Rate Cases,* 230 U.S. 352, 434; *Georgia Railway & Power Co.* v. *Railroad Commission,* 262 U.S. 625, 630; *Bluefield Water Works Co.* v. *Public Service Commission,* 262 U.S. 679, 690.

The actual cost of the property—the investment the owners have made—is a relevant fact. *Smyth* v. *Ames,* 169 U.S. 466, 547. But while cost must be considered, the Court has held that it is not an exclusive or final test. The public have not underwritten the investment. The property, on any admissible standard of present value, may be worth more or less than it actually cost. The time and circumstances of the outlay, and the effect of altered conditions demand consideration. Even when cost is revised so as to reflect what may be deemed to have been invested prudently and in good faith, the investment may embrace property no longer used and useful for the public. This is strikingly illustrated in the present case, where the Company has a large gas manufacturing plant which, in view of the supply of natural gas, has not been used for several years and is not likely to be used for many years to come, if at all. But no one would question that the reasonable cost of an efficient public utility system " is good evidence of its value at the time of construction." We have said that " such actual cost will continue fairly well to measure the amount to be attributed to the physical elements of the property so long as there is no change in the level of applicable prices." *McCardle* v. *Indianapolis Water Co.,* 272 U.S. 400, 411. And when such a change in the price level has occurred, actual experience in the construction and development of the property, especially experience in a recent period, may be an important check upon extravagant estimates.

This Court has further declared that, in order to determine present value, the cost of reproducing the property is a relevant fact which should have appropriate consideration. *Southwestern Bell Telephone Co.* v. *Public Service Commission,* 262 U.S. 276, 287, 288; *Bluefield Water Works* v. *Public Service Commission, supra; Standard Oil Co.* v. *Southern Pacific Co.,* 268 U.S. 146, 156; *McCardle* v. *Indianapolis Water Co., supra,* p. 410. In *Southwestern Bell Telephone Co.* v. *Public Service Commission, supra,* this Court said that " it is impossible to ascertain what will amount to a fair return upon properties devoted to public service without giving consideration to the cost of labor, supplies, etc., at the time the investigation is made. An honest and intelligent forecast of probable future values, made upon a view of all the relevant circumstances, is essential. If the highly important element of present costs is wholly disregarded, such a forecast becomes impossible." See *St. Louis & O'Fallon Ry. Co.* v. *United States,* 279 U.S. 461, 485. But again, the Court has not decided that the cost of reproduction furnishes an exclusive test. See *Smyth* v. *Ames, supra; Minnesota Rate Cases, supra; Georgia Railway & Power Co.* v. *Railroad Commission, supra.* We have emphasized the danger in resting conclusions upon estimates of a conjectural character. We said, in *Minnesota Rate Cases, supra,* p. 452,—" The cost-of-reproduction method is of service in ascertaining the present value of the plant, when it is reasonably applied and when the cost of reproducing the property may be ascertained with a proper degree of certainty. But it does not justify the acceptance of results which depend upon mere conjecture. It is fundamental that the judicial power to declare legislative action invalid upon constitutional grounds is to be exercised only in clear cases. The constitutional invalidity must be manifest and if it rests upon disputed questions of fact, the invalidating facts must be proved. And

this is true of asserted value as of other facts." The weight to be given to actual cost, to historical cost, and to cost of reproduction new, is to be determined in the light of the facts of the particular case. *McCardle* v. *Indianapolis Water Co., supra.*

In determining the weight to be ascribed in the instant case to historical cost as shown by the evidence, the outstanding fact is that the development of the property had, for the most part, taken place in a recent period. We agree with the Court below that no ground is shown for assailing the valuation placed upon the Company's property by the Commission in 1917, in its first decision (13 C.R.C., p. 724) and which appears to have been accepted by the Company as a starting point in later rate investigations. See 16 C.R.C., p. 481 (1919); 20 C.R.C., p. 96 (1921). The rate base fixed in 1917 was approximately $13,000,000. From that time the cost of additions and betterments was under constant supervision and was established by the Company's records under the accounting regulations of the Commission. From 1917 to 1919 there was but little change, the Company's estimate of capital, and the rate base as fixed by the Commission, for 1919, being under $14,000,000. 16 C.R.C., pp. 481, 482. Thus the additions and betterments which brought the historical cost of the fixed property (with land at current values) up to $58,842,187, as found by the Commission at the end of 1929, took place in the ten preceding years and approximately two-thirds of the latter amount appears to have been the cost of additions and betterments after January 1, 1922, as the rate base taken at that time was approximately $20,000,000. 20 C.R.C., pp. 97, 98. We have had occasion to take judicial notice of the high level of prices of labor and materials prevailing not only from 1917, as incident to the war, but also in 1922 and 1923 and that there was no " substantial general de-

cline " in such prices from that time to 1926.[12] See *Lincoln Gas Co.* v. *Lincoln,* 250 U.S. 256, 268; *Galveston Electric Co.* v. *Galveston,* 258 U.S. 388, 402; *McCardle* v. *Indianapolis Water Co., supra,* p. 412. During these years the historical cost of the Company's fixed property increased by additions and betterments to over $52,000,-000. 29 C.R.C., p. 181. There can be no question that the cost of additions and betterments from 1926—in the period just preceding the Commission's order under review—was good evidence of their value at that time. And, so far as prices of labor and materials are concerned, we find no warrant for a conclusion that there had been any change in levels during the years that intervened from the first valuation in 1917 which made it unfair to the Company, in fixing rates for the future, to take the historical cost as found by the Commission as evidence of the value of the Company's structural property at the time of the rate order. On the contrary, it clearly appears that, by reason of the downward trend, the prices for labor and materials, which were reflected in that historical cost were higher than those which obtained during the later period to which the prescribed rates apply.

We noted at the outset that there is a difference between the parties with respect to the amount which should be taken as historical cost. The Company contends that in entering additions and betterments in its books it charged too little to capital account for overheads, and it directs attention to the opinion of the Commission's engineers that 11.25 per cent. of direct labor and material items could reasonably have been charged to capital for indirect construction costs instead of 6 per cent., the amount actually charged. The difference is over $2,000,000. With an allowance of 11.25 per cent. for overheads, the Commission's engineers estimated the historical cost of fixed

---

[12] See Bulletin on " Wholesale Prices," U.S. Department of Labor, February, 1933.

property at $61,019,662 instead of $58,842,187, allowed by the Commission. It is unnecessary to review the contentions upon this point, as if the valuation were made at the higher figure, while it would exceed the $60,704,000 found by the Commission as historical cost, it would still be under the amount of $65,500,000 which the Commission took, on the basis of fair value, as an undepreciated rate base.

■ Coming to cost of reproduction, we agree with the Court below that the items included in the Company's estimate for "cost of financing, $5,921,470," and "promoters' remuneration, $2,500,000," were too conjectural to be allowed. *Wabash Valley Electric Co.* v. *Young,* 287 U.S. 488, 500. Aside from these items, and that of going value to which we shall presently refer, the Company's estimate of cost of reproduction new of the fixed property, without deduction for depreciation, was $77,-586,700, which included $831,781 for organization and franchises, leaving for the physical property $76,754,919. While this estimate was described as of January 1, 1930, it was stated to be based, not on spot prices of that date, but upon prices which were "close to the average" of the prevailing prices for the preceding three years. That is, the estimate rests on prices prevailing from 1927 to 1929, inclusive. In making this calculation, overheads were taken at 24.27 per cent. The estimate made by the Commission's engineer of reproduction cost new, without depreciation, which most closely corresponds to the above estimate of the Company, was $73,637,542, including $427,406 for organization and franchises, leaving $73,-210,136 for the physical property. This estimate was of December 31, 1929, but was based on four-year average unit prices for the years 1926 to 1929, and overheads were figured at 22.32 per cent.

In both of these estimates the gas manufacturing plant was included without any deduction for disuse. The sum

of $12,134,665 was included in the Company's estimate as the cost of reproducing this plant.. Whatever may be said of the propriety of, including this entire plant in a valuation based on historical cost, in the light of prudent investment, we perceive no reason for embracing unnecessary facilities in an estimate of cost of reproduction. In a new construction under, present, conditions it does not appear that such an extensive manufacturing plant would be established,·and the finding of the District Court is amply sustained that if the manufacturing facilities no longer needed had been eliminated, the fair value base would have been reduced by about $3,000,000. With that deduction, the estimate of the Commission's engineer would be about $70,000,000, without allowance for depreciation.

We find it unnecessary, however, to consider the details of these estimates, for there is a fundamental objection to their acceptance as a basis for a finding of confiscation. The determination of present value is not an end in itself. Its purpose is to afford ground for prediction as to the future. It is to make possible an " intelligent forecast of probable future values " in order that the validity of rates for the future may be determined. "Estimates for to-morrow," the Court has said, " cannot ignore prices of to-day." Southwestern Bell Telephone Co. v. Public Service Commission, supra; Bluefield Water Works v. Public Service Commission, supra, p. 691; St. Louis & O'Fallon Ry. Co. v. United States, supra. But we know that the estimates of present value, taken as the cost of reproduction as of December 31, 1929, based upon average prices from 1926 or 1927 to 1929, furnished no dependable criterion of values in the succeeding years. The country was facing a most serious decline in prices. It was entering upon a period of such depression as to constitute " a new experience to the present generation."

It was not the usual case of possible fluctuating conditions but of a changed economic level. *Atchison, Topeka & Santa Fe Ry. Co.* v. *United States*, 284 U.S. 248, 260, 262. That an important change was in progress was shown by the evidence submitted on the application for interlocutory injunction in January, 1931, to which we have already referred. The Commission's witness then called attention to the downward trend of prices, estimating the cost of the property on the basis of prices prevailing December 15, 1930, and taking overhead at 6 per cent., at $60,009,099 as against $64,082,282 as of December 31, 1929, and $63,399,822 as of June 15, 1930. See *supra*, p. 6. The mistaken outlook of the Company's expert witness is disclosed by his affidavit in reply, supporting his former estimate, that, in his opinion, prices for the immediate future, and " for several years to come," would be " on the average higher than the present level and approximately at the 1929 level." It is apparent that the estimates of cost of reproduction new of 1929, or of 1930, upon which the Company relies, afforded no secure foundation for prediction of future values, and the rate base as fixed by the Commission is not to be invalidated as involving confiscation by reason of these estimates which the course of events deprived of credit as trustworthy prophecies.

■ No ground appears for challenging the finding of the Commission, made upon inspection and appraisal, that the accrued depreciation of the property amounted to $7,650,000. While not admitting the accuracy of the finding, the Company does not undertake to contest it here, but takes the amount as the maximum which can be allowed upon the evidence. In determining present value, deduction must be made for accrued depreciation. *Knoxville* v. *Knoxville Water Co.*, 212 U.S. 1, 10; *Minnesota Rate Cases, supra*, pp. 457, 458. But the Commis-

sion made its calculation of the Company's return, under the rates prescribed, upon the rate base it fixed, undepreciated.

■ As an item additional to the estimates of value thus far considered, the Company claims to be entitled to an allowance of $9,228,667 for "going value." This Court has declared it to be self-evident "that there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced," and that this element of value is "a property right" which should be considered "in determining the value of the property upon which the owner has a right to make a fair return." *Des Moines Gas Co.* v. *Des Moines,* 238 U.S. 153, 165; *Denver* v. *Denver Union Water Co.,* 246 U.S. 178, 191, 192; *McCardle* v. *Indianapolis Water Co., supra,* p. 414. The going value thus recognized is not to be confused with good will, in the sense of that "element of value which inheres in the fixed and favorable consideration of customers, arising from an established and well-known and well-conducted business," which, as the Court has repeatedly said, is not to be considered in determining whether rates fixed for public service corporations are confiscatory. *Des Moines Gas Co.* v. *Des Moines, supra.* See *Willcox* v. *Consolidated Gas Co.,* 212 U.S. 19, 52; *Cedar Rapids Gas Co.* v. *Cedar Rapids,* 223 U.S. 655, 669; *Galveston Electric Co.* v. *Galveston, supra,* p. 396. Nor does this recognition of going value countenance a mere attempt to recoup past losses. *Galveston Electric Co.* v. *Galveston, supra,* pp. 394, 395. Deficits in the past do not afford a legal basis for invalidating rates, otherwise compensatory, any more than past profits can be used to sustain confiscatory rates for the future. *Board of Commissioners* v. *New York Telephone Co.,* 271 U.S. 23, 31, 32. The concept of going value is not to be used to escape the

just exercise of the regulatory power in fixing rates, and, on the other hand, that authority is not entitled to treat a living organism as nothing more than bare bones.

The principle as thus recognized and limited is obviously difficult of application. *Cedar Rapids Gas Co.* v. *Cedar Rapids, supra.* It does not give license to mere speculation; it calls for consideration of the history and circumstances of the particular enterprise, and attempts at precise definition have been avoided. It is necessary again, in this relation, to distinguish between the legislative and judicial functions. It is the appropriate task of the Commission to determine the value of the property affected by the rates it fixes, as that of an integrated, operating enterprise, and it is the function of the Court in deciding whether rates are confiscatory not to lay down a formula, much less to prescribe an arbitrary allowance, but to examine the result of the legislative action in order to determine whether its total effect is to deny to the owner of the property a fair return for its use.

Thus, in *Cedar Rapids Gas Co.* v. *Cedar Rapids, supra,* this Court noted that, in the decision under review, the fact "that the plant was in successful operation" had expressly been taken into account and that a value had been fixed which "considerably exceeded its cost," and hence the court found no warrant for changing the result. In *Des Moines Gas Co.* v. *Des Moines, supra,* the Court, dealing with the Master's report and the exclusion of a special item for going value, observed that the Master, "applying the rule of the *Cedar Rapids* case," had "already valued the property in the estimate of what he called its physical value, upon the basis of a plant in actual and successful operation." As the Master had included overheads at 15 per cent. in that valuation, in addition to organization expenses, the Court was unable to hold that "the element of going value" had not been given the consideration it deserved. In *Denver* v. *Den-*

*ver Union Water Co., supra,* the Court, premising that
" each case must be controlled by its own circumstances,"
pointed out that the Master had " expressly declared that
his detailed valuation of the physical property and water
rights included no increment because the property con-
stituted an assembled and established plant, doing busi-
ness and earning money," and that an examination of his
elaborate report convinced the Court that this was true.
And in that case the Court found that the return allowed
by the ordinance in question was clearly confiscatory.
In *Lincoln Gas Co.* v. *Lincoln, supra,* pp. 267, 268, the
Court questioned the propriety of the Master's treatment
of going value, but noting compensatory errors in favor
of the complainant could not conclude that the Master
was wrong in holding that the ordinance was not shown
to be confiscatory. In *Galveston Electric Co.* v. *Galves-
ton, supra,* the Court took occasion to say that the ex-
pressions in the *Denver* case and in the *Lincoln* case were
not to be taken as modifying in any respect the rule
declared in the *Des Moines* case as to the exclusion of
good will. In *Georgia Railway & Power Co.* v. *Railroad
Commission, supra,* the finding below as to going value
was not disturbed. In *Bluefield Water Works Co.* v. *Pub-
lic Service Commission, supra,* while ten per cent. had been
added for going value, the total result was a valuation
which could not be sustained. In *McCardle* v. *Indianap-
olis Water Co., supra,* where the rates were held to be
confiscatory, the Court found that the evidence was
" more than sufficient to sustain 9.5 per cent. for going
value " and that the Commission's engineer had made no
appraisal of that element.

In the light of these decisions, our inquiry must be,
*first,* as to the actual scope and effect of the legislative
determination in relation to the value of the property as
that of an integrated and established enterprise, and,
*second,* whether the evidence requires the conclusion that

by reason of the inadequacy of the valuation the result is confiscation. As to the first question, it is urged that the Commission declined to allow any amount for going value. It is true that the Commission, refusing to admit the assumptions underlying the Company's claim for the amount of $9,228,667 as going value, stated that it did allow "for the so-called intangible going concern value by treating its cost as a current operating expense." But we cannot fail to give effect to the fact that the Commission, determining its rate base at $65,500,000 for 1930, on the basis of fair value, stated that (apart from deduction for accrued depreciation) this amount was "the fair value of the property here involved as a going property with business attached, giving full effect to the current level of prices and allowing for any intangible elements of value not fully cared for in the usual and current operating expense." And the District Court, in its majority opinion, concluded that "this rate base figure of fair value" included "original organization costs and franchise values as well," and "assumed a live active plant and affirmed that the ultimate total included all costs of attaching business as the same had accrued and been accounted for." What the Commission did was to take the historical cost of the plant, calculated on the same basis as to cost of additions and betterments as that used in the several previous rate proceedings, and this amount, together with the sums allowed for materials and supplies, and for working capital, with the additional allowance for interest, with the amount assigned to organization expenses and franchises, and with land at current values, made up a total "historical cost" of $60,704,000. To that total, the Commission added $4,796,000 in reaching its fair value figure, or rate base, of $65,500,000. Included in that rate base was approximately $10,500,000 as the cost of the gas manufacturing plant, or about $3,000,000 which, as the District Court found, represented facilities no longer

needed. Eliminating the latter amount, the margin in the rate base, as taken at fair value, over historical cost, was about $7,796,000. If allowance be made for increased overheads, by taking them at 11.25 per cent. in figuring the cost of additions and betterments (instead of the 6 per cent. as allocated to capital by the Company in its books), the allowance of which the Company urges in the light of the testimony of the Commission's engineers, and if the difference of $2,177,765 be deducted, there would still remain $5,618,235 in the rate base over the historical cost as thus revised. As the historical cost of the far greater part of the fixed property appears to have been taken at price levels which were higher than those which have obtained in the period to which the prescribed rates are applicable, and cannot fairly be said to underestimate the value of the plant as of that period, this excess amount of over $5,500,000 can appropriately be assigned to elements of value which may not have been fully covered. The record affords no adequate basis for criticising the allowance made by the Commission for materials and supplies and working capital, and thus the entire excess may be regarded as applicable to whatever intangible value the property had as a going concern. The fact that this margin in the rate base was not described as going value is unimportant, if the rate base was in fact large enough to embrace that element.

The remaining question, then, is whether the Company has proved, with requisite persuasiveness, a greater amount for going value than that which may be treated as substantially allowed. An examination of the evidence offered by the Company upon this subject shows it to be of a highly speculative and uncertain character. There were two witnesses and the grounds of their estimates put their results in a strong light. The Company's valuation expert, Mr. Luick, gave three methods which he had used as guides in the forming of his judgment as to going

318

value. The first method was " gross revenue," which the witness used on the basis of his experience " that a purchaser will ordinarily and reasonably pay for a property with .established earnings, and on a stabilized operating basis approximately one year's gross revenue over and above the value of physical property." This basis the witness said would indicate a going value of $15,801,208.21 " based on revenues for the year ended December 31, 1929." His second method was to take a percentage of the physical property, the witness stating that in his opinion a purchaser " would pay approximately 15 per cent. above the cost of reproduction because of the going value of a property so developed." This percentage produced a total of $10,638,005. The third method he called the " consumer method " which was based on a cost of not less than $25 per meter and gave an aggregate of $8,886,-700. The witness said that he had also given consideration to the fact that the Company had " an exceptionally good history of growth, an established business, with satisfactory record of earnings and excellent future prospects." The witness alluded to the growth of Los Angeles and adjoining communities, and considering all these factors estimated the going value as of January 1, 1930, at $10,000,000.

The other witness, Mr. Miller, took Mr. Luick's construction program, in which the latter had figured the cost of reproduction, and had assumed that there would be turned over to the operating department " one-twentieth of the service mains during each quarter of the second to sixth years inclusive." Estimating year by year the cost of securing the business during the construction period, the witness took the difference between 8 per cent. interest on the property used and useful during the year and the net earnings estimated to have been received, and the total of these differences with interest, during the period assumed to be required, was taken to represent the cost of

securing the present business of the Company. This was thus calculated to amount, from the second through the seventh year inclusive, to $8,721,878. To this sum the witness added as the estimated cost " of organizing property and personnel," $506,789, thus reaching the total of $9,228,667 which the Company claims as going value. It is unnecessary to analyze the testimony of these witnesses, as it is obviously too conjectural to justify us in treating the failure to include their estimates as a sufficient basis for a finding of confiscation.

Our conclusion is that the Company has failed to sustain its attack upon the rate base of $65,500,000.

■ The Commission calculated that the Company would have a return of 7 per cent. on this rate base. We said in *Bluefield Water Works Co.* v. *Public Service Commission, supra,* pp. 692, 693, that a " public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures." We added that the return " should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties." And we recognized that " a rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally." See *Smith* v. *Illinois Bell Telephone Co.,* 282 U.S. 133, 160, 161. Applying these principles, and considering the financial history of

the Company,[13] its relations and opportunities, and the general situation as to investments, we find it impossible to hold that a return of 7 per cent. is so low as to be confiscatory. *Wabash Electric Co.* v. *Young, supra,* p. 502.

The question, then, is as to the estimates of revenue and expenses. The Company complains that the Commission's estimate of revenue was too high. The problem largely concerns temperatures, and it is plain that the Commission was justified, in fixing rates which were to apply for a considerable period, in taking average temperatures. The District Court, with its special knowledge of local conditions, and speaking in April, 1932, held that the action of the Commission was fair. The Circuit Judge supplemented this finding of the majority by his holding that there was " nothing unreasonable in the estimate of returns by the Commission so far as temperature is concerned " and that there was " nothing to indicate that due consideration was not given to the possible effect of the depression upon the consumption of, gas." 58 F. (2d) 262, 286.

The controversy as to estimate of expenses turns on the sufficiency of the depreciation annuity allowed by the Commission. The company claimed $2,344,000 (or $2,306,606) as against the Commission's allowance of $1,072,000. But it is not clearly shown that what the Commission allowed will not be adequate protection for the purpose in view, and there is no basis for concluding that the Commission's practice under which the Company has accumulated a large depreciation reserve has resulted in injustice to the Company.[14] The fact that the property represented by the Company's depreciation reserve could not be used to support the imposition of a confiscatory rate did not make it necessary for the Commission to make an annual allowance which in

---

[13] See Note 1.

[14] See Note 1.

the light of experience would be excessive. *Smith* v. *Illinois Bell Telephone Co., supra,* p. 158. The Commission was entitled to form its judgment, and the three judges in the court below were agreed in the view that the discretion of the Commission in this regard had not been unreasonably exercised. We see no reason to disturb this conclusion.

The few minor questions which remain do not require specific mention.

*Decree affirmed.*

Mr. Justice Van Devanter did not hear the argument and took no part in the consideration and decision of this case.

Mr. Justice Butler, dissenting.

This is an important case. The amount at stake is great, and the principles involved are more important. The reduction made by the commission when prescribing what it found to be reasonable rates, October, 1928, is not definitely shown. But the amount by which the rate of return was reduced indicates a probable reduction by more than a million per year. The net reduction made in November, 1930, by the order under consideration is more than one million per year. That is enough to yield a return of seven per cent. on over $14,000,000. There is also involved more than $2,500,000 now held by the company subject to claims of customers that it be refunded to them if the order shall be sustained.

The commission, following theories that admittedly are contrary to our decisions in confiscation cases, refused to ascertain or to consider the value of the property.[1] It

---

[1] The report (35 C.R.C. 443) in this case states (p. 445): " This Commission for many years, in the exercise of its jurisdiction to establish reasonable rates for utilities of this character, has fixed rates to yield upon the historical or actual cost of the property, taking land, however, at current values and depreciation calculated on a sinking

made the last reduction upon mere cost figures. Its "fair value" figure is higher than its "historical cost." The

fund basis, a return somewhat in excess of the cost of the money invested in the property." And Commissioner Decoto said (p. 474) : "For thirty-two years the Supreme Court of the United States has consistently adhered to the controlling principles of valuation laid down by it. In spite of the fact that the pathway is now made reasonably clear by the decisions of the courts, some state commissions seem to be inclined to be a law unto themselves and persist in ignoring the law as laid down by the courts. The California Commission has to all outward appearance been one of these. It has clung ostensibly and theoretically to the historical rate base. In reality it has given effect to the different elements mentioned by the federal courts including fair value including going value by allowing a rate return between 8 per cent. and 8½ per cent. on historical cost if there be added to the historical rate base an amount between 10 per cent. and 12½ per cent., the rate base so obtained will approximate fair value including going value. So, also if there is deducted from 10 per cent. to 12½ per cent. from a rate of return of 8 per cent. or 8½ per cent. on an historical cost rate base, it is readily seen that there is an actual return varying from 7 per cent. to 7.75 per cent. upon fair value including therein a reasonable amount for going value. With this arrangement our public utilities have been content. During the last two years this commission has shown a tendency to cut the rate return upon an historical rate base from between 8 per cent. and 8½ per cent. to 7 per cent., which reduced the rate of return upon a fair value base to 6.12½ per cent. and 6.3 per cent. This is confiscation and not regulation."

The president of the commission, October 21, 1931, in an address before the National Association of Railroad and Public Utilities Commissioners apparently in opposition to constitutional law as established by numerous decisions here, said: "It is safe to say that in practically none, if any of the cases in which there have been permanent injunctive orders issued by the federal courts, would actual confiscation have followed the Commission findings. This is stated not only from general knowledge of the facts but from specific knowledge of the experience in California. A study of the court opinions indicates beyond reasonable doubt that in practically every major rate case in the last seventeen years in that state the findings of the Commission could not have withstood the test imposed by the federal tribunals." Report, Forty-third Annual Convention, 1931, pp. 180, 190.

commission based that increase on its finding that unit prices properly applicable to the prescribing of reasonable rates for the future are higher than were those actually paid throughout the years for the construction of the property. This increase amounted to $4,796,000 and it was found correct by the district court and also in the concurring opinion below. But this court excludes it and holds to original cost. The amount involved in that item alone is more than enough to require reversal.

The commission excluded from overhead expenditures actually made by the company the difference between six per cent. and 11.25 per cent. upon the ground that the company charged such difference to operating expenses and not to capital. It refused to give any consideration to the findings of its own engineer that in a proper estimate of the cost of reproduction as of the date of the inquiry such overheads would exceed 22 per cent. The company's estimate was about 24 per cent. Each of these rulings is directly contrary to our decisions. *Board of Comm'rs* v. *N. Y. Tel. Co.*, 271 U.S. 23, 31; *S. W. Tel. Co.* v. *Pub. Serv. Comm'n*, 262 U.S. 276, 287; *Ohio Utilities Co.* v. *Commission*, 267 U.S. 359, 362; *McCardle* v. *Indianapolis Water Co.*, 272 U.S. 400, 408–410; *St. L. & O'Fallon Ry. Co.* v. *United States*, 279 U.S. 461, 484–485. The district court followed the commission. This court in accordance with law settled by its own decisions, repudiates that method of treating overheads and adopts 11.25 per cent. It refuses, as did the commission and the lower court, to give any weight to admitted reproduction cost in respect of overhead expenditures.

The valuation by the commission was based upon an inventory agreed to be correct by the plaintiff and commission. It included two standby plants to which the commission attributed $3,000,000. The district court adopted that figure. It declared, 58 F. (2d) 259, that

324

the commission included these plants as a "live, neces-sary part of the operative property."[2] But this court excludes the item. Three million so thrown out is sufficient to require reversal. It was for the commission to decide whether these plants are required properly to safeguard the public service. This court should hesitate long before holding they are not. Seven per cent. on three million dollars so eliminated is $210,000, about 58 cents on each of the 385,000 meters, a small charge to insure readiness to serve.

The commission refused to consider or allow anything for going value. Plaintiff's gas properties adequately serve a great and, before the present depression, a rapidly growing demand. If permitted to charge reasonable rates, or those merely high enough to be non-confiscatory, plaintiff will continue to be able to earn an ample rate of return upon the value of the property. Its charges for gas are low in comparison with those generally collected for like service. The record shows that, having regard to the effective thermal units in the natural gas that plaintiff has been furnishing in recent years, its rates are less than one-half those formerly collected by it. And, in absence of contrary showing and finding, its charges must be deemed to have been considered just and reasonable by the regulatory authorities of the State and by the public.

---

[2] The court's statement follows: "The commission was very liberal in its treatment of certain items of property. The company in its early operations furnished artificial gas. Since 1924 it has served natural gas, which is plentiful in the numerous oil fields in Southern California. There is no evidence which discredits the commission's conclusion that the supply of natural gas will be abundant and constant. The commission found in effect that at least two of the artificial gas manufacturing plants of plaintiff were no longer needed and might well be retired. Nevertheless, it included them in its valuation as a live necessary part of the operative property. It appears that, had these plants been eliminated, the fair value base would have been reduced by approximately $3,000,000." 58 F. (2d) 256, 259.

Unquestionably, and the opinion of this court so implies, millions should be added to the cost figures applicable to the physical items in order to find the value of plaintiff's property, the amount protected by the Constitution. The ground on which the commission excluded going value was that the cost of attaching the business was charged to operating expenses. The district court followed the commission. That being contrary to law, this court repudiates the rulings of both and uses over $5,500,000 as going value. Its calculations to reach value produce a figure substantially the same as the commission's " fair value " cost figure. But that was attained by the application of formula, a thing repeatedly condemned here. *Minnesota Rate Cases*, 230 U.S. 352, 434; *Bluefield Water Works Co.* v. *Pub. Serv. Comm'n*, 262 U.S. 679, 690; *McCardle* v. *Indianapolis Water Co.*, 272 U.S. *supra*, 410.

This Court's conclusion—depending upon mere coincidences—that value is the same as the " fair value " cost figures found by the commission is without support. The figure used to cover going value was arrived at upon considerations that have no relation to the amount that in any view reasonably may be assigned to that element. It comes about thus: Add $3,000,000 (made available by excluding the standby plants found necessary by the commission and included by the district court) to $4,796,000 (obtained by reversing the findings of commission and accepted by the lower court in respect of unit prices). A part of that total is used to neutralize the errors in law committed by the commission and the lower court in respect of overheads. Enough is taken to increase that item from 6 per cent. to 11.25 per cent. And the calculated balance, $5,618,235, is assigned to going value. That figure certainly is not the result of an appraisal or valuation of plaintiff's going value. Neither the amount attributed to the standby plants eliminated by this court nor the

commission's addition to original cost to get its "fair value" figure has any relation to going value. When in confiscation cases any going value exists, the amount justly attributable thereto must be ascertained and included. See, e.g., *National Waterworks Co.* v. *Kansas City,* 62 Fed. 853, 865; *Omaha* v. *Omaha Water Co.,* 218 U.S. 180, 202; *Des Moines Gas Co.* v. *Des Moines,* 238 U.S. 153, 165; *Denver* v. *Denver Union Water Co.,* 246 U.S. 178, 192; *Galveston Elec. Co.* v. *Galveston,* 258 U.S. 388, 396; *McCardle* v. *Indianapolis Water Co., supra,* 414; *People ex rel. Kings County L. Co.* v. *Willcox,* 210 N.Y. 479, 486; 104 N.E. 911.

The rates should be set aside because arrived at by arbitrary methods condemned by our decisions.

The State, by the exertion of legislative power, established the rule that public utility rates, including those charged for gas, shall be just and reasonable. It is powerless to enforce, and therefore must be presumed to have intended that its commission should not attempt to prescribe, confiscatory rates. The commission's field of action is within reasonable limits above the point or line where confiscation would commence. *Banton* v. *Belt Line Ry.,* 268 U.S. 413, 422–423. In ascertaining the return protected by the Constitution, the commission is required to take into account and make proper allowances for the actual original, and the estimated present, cost of the property, including overheads. It is bound to include a just and reasonable amount to cover going value. The amount omitted in respect of each of these items is large enough to invalidate rates based on the valuation. There is no warrant for inquiry by this court to ascertain whether under the evidence the valuation of the property might otherwise have been pared down to the figure used by the commission and adopted by the district court. It is definitely settled by our decisions that where public utility rates, prescribed by a state commission as reasonable, are

attacked as confiscatory, the courts may inquire into the method by which the commission's conclusion was reached and that, if such rates are based upon property valuation or other essential fact that was arbitrarily arrived at or that is without support in the evidence, such rates will be set aside. *Northern Pac. Ry. Co.* v. *Dept. Public Works,* 268 U.S. 39, 42–45; *Chicago, M. & St. P. Ry. Co.* v. *Pub. Util. Comm'n,* 274 U.S. 344, 351; *St. L. & O'Fallon Ry. Co.* v. *United States, supra,* 485. Cf. *United States* v. *Abilene & So. Ry.,* 265 U.S. 274, 288; *Chicago Junction Case,* 264 U.S. 258, 263; *Interstate Commerce Commission* v. *Union Pacific R. Co.,* 222 U.S. 541, 547.

The lower court's decree and opinion taken together may not reasonably be construed to comply with Equity Rule 70½. In confiscation cases, the rule should be strictly enforced. The trial court should make a definite and complete statement of the facts on which it rests its judgment. Cf. *Aetna Insurance Co.* v. *Hyde,* 275 U.S. 440, 447. In a number of cases decided in recent years specially constituted district courts failed to make definite findings or to give reasons upon which they grounded their decrees. This court repeatedly and emphatically reminded them of the proper practice and required that it be followed. *Virginian Ry. Co.* v. *United States,* 272 U.S. 658, 675; *Lawrence* v. *St. L.-S. F. Ry.,* 274 U.S. 588, 596; *Arkansas R. R. Comm'n* v. *Chicago, R. I. & P. Ry. Co.,* 274 U.S. 597, 603; *Hammond* v. *Schappi Bus Line,* 275 U.S. 164, 171; *Cleveland, C., C. & St. L. Ry. Co.* v. *United States,* 275 U.S. 404, 414; *B. & O. R. Co.* v. *United States,* 279 U.S. 781, 787; *Railroad Commission* v. *Maxcy,* 281 U.S. 82; *Smith* v. *Illinois Bell Tel. Co.,* 282 U.S. 133, 162; *Tax Commissioners* v. *Jackson,* 283 U.S. 527, 533; *Public Service Comm'n* v. *Northern Indiana Co., post,* p. 703; *Public Service Comm'n* v. *Wisconsin Tel. Co., ante,* p. 67. Finally, June 2, 1930, we promulgated the rule, 281 U.S. 773: " In deciding suits in equity, including those re-

quired to be heard before three judges, the court 'of first instance shall find the facts specially and state separately its conclusions of law thereon; and its findings and conclusions shall be entered of record and, if an appeal is taken from the decree, shall be included by the clerk in the record which is certified to the appellate court under rules 75 and 76."

The command that the trial court " shall find the facts specially " means at least that the statement shall be definite, concise and complete as distinguished from discursive, argumentative, obscure or fragmentary. *Tax Commissioners* v. *Jackson, supra,* 533. The direction " and state separately its conclusions of law thereon " shows that discussion of facts and law in the course of explanation, reasoning or opinion to clarify or support the conclusion or judgment reached, is not sufficient. The opinion filed in this case as a concurring one appears on its face to have been prepared for adoption by and as the opinion of the court. It was not accepted by either of the other judges; in any event that opinion could not be considered a compliance with the rule. The rule was intended to make unnecessary, analysis or extended examination for the ascertainment of the facts and propositions of law on which rest decrees of the courts of first instance. The opinion of the majority does not purport to " find the facts specially " or to " state separately its conclusions of law thereon."

The decree is not a compliance with the rule. " The court now finds that the values for plaintiff's property as fixed and determined by the defendant Railroad Commission are the reasonable values thereof; that the rates fixed are such as to render a reasonable return on such values and that said rates are therefore not confiscatory. And the court adopts, as representing its further findings, the opinion filed herein on April 8, 1932, as concurred in by the two district judges who participated in the hearing

and decision hereof." This is within the condemnation of our decisions. *Railroad Commission* v. *Maxcy, supra; Tax Commissioners* v. *Jackson, supra; Public Service Comm'n* v. *Northern Indiana Co., supra.*

*Public Service Comm'n* v. *Wisconsin Tel. Co., supra,* decided after the argument of this case, is of special interest. The commission appealed from an interlocutory decree declaring that enforcement of telephone rates prescribed by the commission would result in confiscation of the company's property. The district court filed no opinion and made no special findings of fact. The company moved to affirm. The commission's contention was that the decree should be reversed for lack of specification of the facts on which it rested. The company maintained that the decree was abundantly sustained by the facts shown in the record. We held that Rule 70½ does not apply to decisions on applications for temporary injunctions and made it clear that the duty of the court in passing on such applications was not altered by the adoption of the rule. We said (*ante,* p. 70): "While an application for an interlocutory injunction does not involve a final determination of the merits, it does involve the exercise of a sound judicial discretion. That discretion can be exercised only upon a determination, in the light of the issues and of the facts presented, whether the complainant has made, or has failed to make, such a showing of the gravity of his complaint as to warrant interlocutory relief. Thus, if the issue is confiscation, the complainant must make a factual showing of the probable confiscatory effect of the statute or order with such clarity and persuasiveness as to demonstrate the propriety in the interest of justice, and in order to prevent irreparable injury, of restraining the State's action until hearing upon the merits can be had. . . . the court should make the findings of fact and conclusions of law that are appropriate to the interlocutory proceeding." And we refused, even when

aided by adequate brief and argument of counsel, to consider whether the temporary injunction was warranted by the facts shown in the record. We vacated the decree with costs against the utility and remanded the case for findings and conclusions appropriate to a decision upon the application for an interlocutory injunction. And it is the purpose of this court to promulgate a rule definitely requiring district courts to make special findings of fact in such cases.

The reasons for the enforcement of such a rule are stronger where final judgment is entered. The work done for the court by the writer of the opinion should not be undertaken here. Our rules do not permit adequate opportunity for presentation of such cases as upon trial *de novo*. Nor is the time that the Justices can give to preparation for and in our conferences sufficient to enable them to reach reasonable conclusions in respect of the bases or details of calculations, revisions and determinations reflected by the elaborate opinion in this case.

We should follow *Public Service Comm'n v. Wisconsin Tel. Co.,* vacate the decree and remand the case for special findings. The district court should appoint a special master to hear the parties, m..ke specific findings of fact, and state separately his conclusions of law and recommendation for a decree.

The district court should have referred the case to a special master for such a report. Experience has made it plain that rate confiscation cases are intricate in respect of facts and involve complicated, grave and difficult questions that are impossible of adequate examination by a court without the assistance of a master. *Dubourg de St. Colombe's Heirs v. United States,* 7 Pet. 625. The report of the commission in this case occupies 54 pages of the record and the opinions of the participating judges extend through more than 71 pages. That the burden of mere analysis, comparison or concordance is very great

can be gathered from the opinion of this court. The lack of definite findings in respect of essential facts is obvious and it is likely that, if the district court had undertaken separately to state its conclusions of law, it would not have fallen into the errors sought to be corrected by the opinion here. Its decision was not announced until more than nine months after final submission of the case. This statement implies no adverse criticism, for it is often difficult for the judges, consistently with performance of their other duties, to give the time required for travel, full hearings, adequate conferences in advance of decision and for preparation of draft opinions. The requirement that three judges shall participate undoubtedly increases the need for a special master.

*Chicago, M. & St. P. Ry. Co.* v. *Tompkins,* 176 U.S. 167, was a confiscation case involving the validity of state-made railroad rates. The trial judge, without the aid of a master, examined the pleadings and proof, made findings of fact, stated his conclusions of law, delivered an opinion and rendered a decree dismissing the bill. But he failed to find an essential fact, the cost of doing local business. This court remanded the case with instructions to refer it to a competent master. Speaking through Mr. Justice Brewer, it said (p. 179): " The question then arises what disposition of the case shall this court make. Ought we to examine the testimony, find the facts, and from those facts, deduce the proper conclusion? It would doubtless be within the competency of this court on an appeal in equity to do this, but we are constrained to think that it would not (particularly in a case like the present) be the proper course to pursue. This is an appellate court, and parties have a right to a determination of the facts in the first instance by the trial court. Doubtless if such determination is challenged on appeal it becomes our duty to examine the testimony and see if it sustains the findings, but if the facts found are not challenged by either party

332

then this court need not go beyond its ordinary appellate duty of considering whether such facts justified the decree. We think this is one of those cases in which it is especially important that there should be a full and clear finding of the facts by the trial court. The questions are difficult, the interests are vast, and therefore the aid of the trial court should be had. The writer of this opinion appreciates the difficulties which attend a trial court in a case like this. In *Smyth v. Ames, supra,* a similar case, he, as Circuit Judge presiding in the Circuit Court of Nebraska, undertook the work of examining the testimony, making computations, and finding the facts. It was very laborious, and took several weeks. It was a work which really ought to have been done by a master . . . We are all of opinion that a better practice is to refer the testimony to some competent master, to make all needed computations, and find fully the facts. It is hardly necessary to observe that in view of the difficulties and importance of such a case it is imperative that the most competent and reliable master, general or special, should be selected, for it is not a light matter to interfere with the legislation of a State in respect to the prescribing of rates, nor a light matter to permit such legislation to wreck large property interests."

*Lincoln Gas Co.* v. *Lincoln,* 223 U.S. 349, involved the validity of a city ordinance regulating charges for gas. The court below failed to make findings of fact in respect of the sums annually required for depreciation and replacements. This court, speaking through Mr. Justice Lurton, said (p. 361): "The cause should have gone at the beginning to a skilled master, upon whose report specific errors could have been assigned and a ruling from the court obtained." The case was remanded to the district court with instructions to refer it to a competent master with directions to report fully his findings upon all questions raised by either party, and with leave to both parties to take additional evidence.

While the practice since *Chicago, M. & St..P. Ry. Co.* v. *Tompkins* has not been uniform, special masters have been appointed quite generally.[3]

To summarize:

1. There is no warrant for reversal here of the commission and district court in respect of unit prices upon which they built up their " fair value " figure. If business conditions since the commission made its order are deemed to affect that figure, we should remand with directions to the district court to find the facts. *Atchison, T. & S. F. Ry. Co.* v. *United States,* 284 U.S. 248, 260, 262.

2. This court should not undertake to ascertain the amount of overheads properly to be included. But, if that matter is to be considered here, the 22 per cent. included in the commission's reproduction estimate and the company's 24 per cent. should not be ignored but should be considered in connection with the 11.25 per cent. in-

---

[3] *Knoxville* v. *Knoxville Water Co.,* 212 U.S. 1; *Willcox* v. *Consolidated Gas Co.,* 212 U.S. 19, 24; *Louisville* v. *Cumberland Tel. & Tel. Co.,* 225 U.S. 430; *Minnesota Rate Cases,* 230 U.S. 352; *Des Moines Gas Co.* v. *Des Moines,* 238 U.S. 153; *Denver* v. *Denver Union Water Co.,* 246 U.S. 178; *Newton* v. *Consolidated Gas Co.,* 258 U.S. 165; *Galveston Elec. Co.* v. *Galveston,* 258 U.S. 388; *Houston* v. *Southwestern Tel. Co.,* 259 U.S. 318; *Brush Elec. Co.* v. *Galveston,* 262 U.S. 443; *Pacific Gas Co.* v. *San Francisco,* 265 U.S. 403; *Railroad Comm'n* v. *Duluth St. Ry. Co.,* 273 U.S. 625; *Denney* v. *Pacific Tel. & Tel. Co.,* 276 U.S. 97; *Wabash Valley Elec. Co.* v. *Young,* 287 U.S. 488. In *Missouri Rate Cases,* 230 U.S. 474, part of testimony was taken by master and part in open court.

None was appointed in: *San Diego Land & Town Co.* v. *Jasper,* 189 U.S. 439; *Louisiana R.R. Comm'n* v. *Cumberland Tel. Co.,* 212 U.S. 414; *Allen* v. *St. Louis, Iron Mt. & S. Ry.,* 230 U.S. 553. (At the urgent request of the parties, the court consented to try the case without the aid of a master. 187 Fed. 290, 294.) *Darnell* v. *Edwards,* 244 U.S. 564; *McCardle* v. *Indianapolis Water Co.,* 272 U.S. 400; *United Fuel Gas Co.* v. *R.R. Comm'n,* 278 U.S. 300; *Railroad Comm'n* v. *Los Angeles Ry. Corp.,* 280 U.S. 145; *Smith* v. *Illinois Bell Tel. Co.,* 282 U.S. 133. (Assigned for the taking of testimony to one of the three judges. 38 F. (2d) 77, 79.)

cluded in the original or historical cost figures. An appraisal of the item should be made on the basis of all the relevant facts.

3. There is no warrant for this court's elimination from the agreed inventory of standby plants which were included by the commission and district court.

4. There has been no appraisal of going value. That element was arbitrarily excluded below. There is no rational foundation for the amount attributed to it here.

5. As the commission's refusal to apply principles of valuation established by our decisions resulted in arbitrary undervaluations, the prescribed rates should on that ground be set aside.

6. The decree appealed from should be vacated and the case remanded for compliance with Rule 70½.

7. The district court should refer the case to a special master to report in accordance with the practice followed in cases such as this.

MR. JUSTICE SUTHERLAND joins in this opinion.