WEISER VALLEY LAND & WATER CO. v. RYAN et al. †

(Circuit Court of Appeals, Ninth Circuit.   October 2, 1911.)

No. 1,942.

**1. EVIDENCE (§ 524\*)—OPINION EVIDENCE—EXPERTS—VALUE OF LAND.**

In a proceeding to condemn land for a dam site in connection with an irrigation project, opinions of expert engineers as to the value of the land, taking into consideration the cost of the land to be utilized, the cost of construction and maintenance of the works, the feasibility of utilizing the water, the prospective amount available, the lands available for irrigation, their value, the value of the water furnished, etc., were admissible under the rule that in determining the value of land to be condemned it must be viewed, not merely with reference to the uses to which it is at the time applied, but with reference also to such uses to which it is manifestly adapted, considering its capability as well as its availability, disregarding, however, its value for any specific purpose as an independent fact.

[Ed. Note.—For other cases, see Evidence, Dec. Dig. § 524.\*]

**2. EMINENT DOMAIN (§ 131\*)—CONDEMNATION OF LAND—"VALUE."**

The value of land sought to be condemned, which the petitioner is required to pay, is not what any one person would give for the land for his own particular use, but what could probably be obtained for it if a sale was desirable and a purchaser sought, applying the ordinary business methods to find him and to dispose of the property.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. § 353; Dec. Dig. § 131.\*

For other definitions, see Words and Phrases, vol. 8, pp. 7275–7280; vol. 8, p. 7826.]

**3. EMINENT DOMAIN (§ 241\*)—PROCEEDINGS—PERSONAL JUDGMENT.**

Under Rev. Codes Idaho, § 5224, providing that, if the damages for land taken in eminent domain proceedings are not paid or deposited, the defendants may have execution as in civil cases, and, if the money cannot be made on execution, the court must annul the entire proceedings and restore possession to the defendant if possession has been taken by the plaintiff, construed in connection with other sections relating to the procedure in an eminent domain proceeding, a personal judgment may be properly rendered against the petitioner for the damages ascertained.

[Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. § 241.\*]

**4. EMINENT DOMAIN (§ 148\*)—DAMAGES—INTEREST.**

Under Rev. Codes Idaho, § 5221, providing that, for the purpose of assessing compensation and damages for land taken or damaged in condemnation proceedings, the right shall be deemed to have accrued at the date of the summons, and its actual value at that date shall be the measure of compensation for all property to be actually taken, the owner is entitled to interest on the damages awarded for land taken from the date of the summons.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 397–399½; Dec. Dig. § 148.\*]

In Error to the Circuit Court of the United States for the District of Idaho.

Condemnation proceedings by the Weiser Valley Land & Water Company against Colonel W. Ryan and another. From a judgment assessing damages, plaintiff brings error. Affirmed.

See, also, 190 Fed. 425.

Richards & Haga, for plaintiff in error.

Lot L. Feltham and Frank D. Ryan, for defendants in error.

Before MORROW, Circuit Judge, and HANFORD and WOLVERTON, District Judges.

WOLVERTON, District Judge. The plaintiff in error, which was the plaintiff below, is a corporation engaged in the construction and maintenance of an irrigation project. For the purpose of obtaining a site for a dam and reservoir, plaintiff instituted a suit to condemn the lands of the defendants, consisting of 320 acres, each of them owning 160 acres. The proposed site is situated in Lost Valley, Washington county, Idaho, at an altitude of from 4,000 to 6,000 feet above sea level. Lost river flows through the valley, and passes out through a narrow canyon. The purpose is to construct a dam 80 feet in height across the stream in the canyon, with a view to impounding the surplus waters produced by the melting snowfall within the watershed around about. The valley contains an area of some 500 to 700 acres of meadow land, including the lands of the defendants. This meadow land rises gradually towards the surrounding hills, but an 80-foot dam would cause the water to flow back to such an extent that it would cover, not only the meadow land, with all the land of defendants, except, possibly, 8 acres, but a large area besides, comprising in all about 1,200 acres. It was estimated that such a reservoir would have a capacity of 60,000 acre-feet, that the water from melting snows would be sufficient to fill it, which would provide irrigation for 20,000 acres of land, and that it is feasible to get the water from the reservoir upon a larger area than that. The defile through which the water passes beyond Lost Valley is of such a nature, with rock walls, that the dam construction could be had at minimum expense, and would be so situated as to be largely free from wave action and erosion.

[1] At the trial G. R. Baker, a civil engineer with large experience in the construction of reservoir and irrigation projects, was called as a witness for the defendants, and testified to the feasibility of constructing the dam and the irrigation canals and ditches contemplated by the plaintiff, and of their practical utility when constructed. Then as follows:

"Assuming that there are lands in Washington county sufficient in area to consume the capacity of this Lost River Basin up to the 52,000 acre-feet, which lands may be irrigated from said water supply at a reasonable amount of expense for the quantity of water furnished, taking into consideration and assuming the natural features of the reservoir as to altitude, topographical features, precipitation as shown by the witnesses in this case, and location for dam facilities, and opportunities of impounding such water, and assuming that there is in said community no established market value for said lands for all purposes for which they are naturally adapted, including reservoir site, assuming that no change has taken place in the topographical features or conditions of said reservoir site since September 4, 1909, I would know the actual value of the lands of the defendants on September 4, 1909, for and in view of all the purposes to which such lands were actually adapted. In my experience I have known of sales made of similar lands like this for reservoir sites. The ones I refer to are located in Colo-

rado. I know of the actual value of another reservoir of similar proportions, similarly situated, of a similar character, and similarly situated in relation to an arid land district. * * * I know of other reservoir sites, the actual value of which I am familiar with, what we call the 'Marshall Reservoir.' I know of the actual value of other reservoir sites than those I have mentioned. I know of some sites that have been sold. I think I would know the actual value of those reservoir sites, those several reservoirs. I think I would know the actual value of this reservoir referred to as the Lost Basin Reservoir, September 4, 1909, in view of all the facts I have learned concerning it by my own investigation, and in view of the testimony of the witnesses produced in the trial of this case. And, assuming the facts that have been presented to me in former questions as to the precipitation and the presumed conditions, that there are lands in Washington county susceptible of irrigation from this reservoir which as yet have no water placed upon them sufficient to consume all the water in the reservoir up to the quantity figured by me as 56,000 acre-feet, in view of all the purposes to which these lands are naturally adapted."

At this time the question was asked: "Now, what in your opinion was the value of those lands at that time?" (September 4, 1909). Whereupon witness further testified, on cross-examination as to his competency:

"When I speak of the value of a reservoir site, I take into consideration the value of the land upon which the water would be distributed, and that the land would be made productive, or I might take into consideration other features of the reservoir sites, as they might be. It might be that the question of domestic purposes should enter into it to a certain extent, and also there might be power purposes that would enter into it. Of course, the price at which those lands will buy water would enter into it. The cost of the distributing canal to take the water from the reservoir to this land would have to be taken into consideration, and the cost of constructing the reservoir would have to be considered; also, the profits that would be made upon the handling of the proposition. The elements that would enter into the profits would, of course, be the amount of money expended in construction and so on—the total cost and the management and operation."

Objection being interposed, the court further interrogated, and witness answered:

"I have stated that I could give the market value of this land now: that is, what it would sell for upon the market last September, under the conditions that question was asked. In reaching the conclusion, I consider the reputed price at which they are selling, and the value of the lands, that is, by irrigating, by being irrigated, the value of irrigated and nonirrigated lands, the value of water that is necessary to make the lands productive. Of course, I base it to a great extent upon the price at which water is sold per acre. I base it upon the price at which water is sold with the schemes with which I am familiar. I have an idea what I would pay for those lands last fall, considering the circumstances and the physical conditions that there are there, with reference to the surroundings. From my observations I feel intelligent enough with regard to the situation, to say what I would be willing to pay. I think I would be willing now to make a bona fide offer for those lands. I feel intelligent enough in regard to it to do that, considering conditions there."

Here the objection was overruled, and witness was permitted to answer:

"I should value those lands last fall at $20,000 a claim; that is, $40,000 for 320 acres."

On cross-examination he further testified:

"I don't know anything about what it would cost to carry water to these lands. I think I could build the dam at the reservoir site for $200,000. I included that in my estimate of the value of these lands. I also included the distribution of the water. I would place it at half a million, that is an arbitrary figure that I have put on it. It wouldn't be just as safe to assume arbitrarily a million as half a million, because I don't think it would cost a million based on my general experience with reference to getting water onto such projects. I don't know anything about the amount of rock work I would have to do, or the earthwork, or the bridges, or the flumes, or the pipe lines or headgates. I don't know anything about those things. I fixed $500,000 as the cost of those canals, because I have never distributed that much water that has cost anywhere that much. That is the only reason I can give. I took into consideration the cost of the dam, at $200,000, and the cost of the distributing works at $500,000, and the sale of the water at $50 per acre, and upon that I base my estimate of $40,000. I also took into consideration the cost of the land in the reservoir; that is, about 1,200 acres of land. I would place the value of that land at $150,000, the value of all the land in the reservoir, so I have $150,000, $200,000, and $500,000—that makes $850,000. I would figure that 60,000 acre-feet of water would irrigate 20,000 acres of land, and 52,000 acre-feet would irrigate in the neighborhood of 17,000 acres, and I am assuming that there is 17,000 acres of land available at that price—at $50 an acre. It would amount to $850,000. I would now have a plant that cost $850,000, and the selling price would be $850,000. When I said I took into consideration the profits, I didn't make my basis upon 17,000 acres. Taking it on a basis of 52,000 acre-feet and 3 acre-feet to the acre, then my cost and selling price are absolutely equal. There wouldn't be any profit in that that I could see."

Robert J. Wood, another witness called for defendants, after being qualified as an expert civil engineer with large acquaintance with the construction of irrigation projects, was interrogated as follows:

"In view of all the facts and the information that you have acquired by your own investigation, and the further testimony of witnesses in this trial, and assuming as a fact that there is a quantity of rainfall sufficient to place in that reservoir annually 52,000 acre-feet, taking into consideration a reasonable per cent. of loss for evaporation and otherwise, and in view of the fact that no market price has been established for lands in that vicinity for all purposes, do you know, or did you know, the actual value of those lands of the defendants on or about September 4, 1909, in view of all the purposes and uses to which said lands are naturally adapted?

"The Court: That is, the value for which this land would sell in cash.

"Witness: That, based on an opinion, I suppose?

"The Court: That is, what would it sell for in cash.

"A. Yes."

After lengthy cross-examination by plaintiff's counsel, the court further explained the question as follows:

"The question is whether or not, in your judgment, whether or not you or any man with money would buy this land in question upon the information which you have. In other words, whether the information which you have is sufficient to enable you intelligently to make an investment, and, if so, what would the business man who has the information which you have, or any man, pay in cash for that land. Now, if you think any business man would buy it on the information which you have, you may so state, you may state what in your judgment it would sell for; that is, if you have any judgment about it. If you haven't, you may so state. You understand, Mr. Wood, we are trying to reach an intelligent estimate of the value of this land, not a mere guess, not a mere speculation, but you should remember that we are here under the solemnity of an oath, and want your best judg-

ment. if you have any, as to what this property is worth. Of course, in forming that judgment, you can form it upon the information which you have, not what might possibly be developed, but what you have at present."

And witness answered:

"Well, I should say, your honor, that I have information enough to satisfy myself as to a value, and that value is what in my judgment a business man who knew the conditions as I know them would pay without further investigation."

Whereupon the court overruled the objection to the question, and witness answered further:

"I should say that defendants' land in the reservoir site, the two claims, were worth $30,000 on September 4, 1909."

Other witnesses were permitted over objection to testify in the same line, but the foregoing is sufficiently illustrative for an understanding and appreciation of the questions involved.

The question for determination is whether this evidence was proper to be admitted to establish the value of the lands sought to be condemned, and thereby to determine the measure of the defendants' damages. The plaintiff's proofs tended to show the value of the lands to range from $8 to $15 per acre, and it is contended that the evidence thus offered by the defendants, and admitted over objection, was speculative, somewhat visionary, and does not afford a certain and substantial basis upon which to determine the market value of the lands in question. The proper basis of inquiry is, What were the lands worth in the market? And this establishes the measure of damages. In ascertaining such value, the property should be viewed, not merely with reference to the uses to which it is at the time applied, but with reference also to the uses to which it is manifestly adapted, taking into account its capability as well as its availability. "As a general thing," says the Supreme Court in Boom Co. v. Patterson, 98 U. S. 403, 408 (25 L. Ed. 206), "we should say that the compensation to the owner is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community, or such as may be reasonably expected in the immediate future."

The scope of inquiry as to value is cogently stated in Alloway v. Nashville, 88 Tenn. 510, 514, 13 S. W. 123 (8 L. R. A. 123):

"It includes [says the court] every element of usefulness and advantage in the property. If it be useful for agriculture or for residence purposes, if it has adaptability for a reservoir site or for the operation of machinery, if it contains a quarry of stone or a mine of precious metals, if it possesses advantage of location or availability for any useful purpose whatever, all these belong to the owner, and are to be considered in estimating its value. It matters not that the owner uses the property for the least valuable of all the ends to which it is adapted, or that he puts it to no profitable use at all. All its capabilities are his, and must be taken into the estimate. This does not mean that all the capabilities are to be priced separately and the aggregate put down as the true value, for they do not exist independently of each other, and cannot all be realized at the same time; nor will it do to restrict the estimate to any one of them because in one view that would exclude the other elements altogether, and in another view it would tend to make the degree of benefit to the party appropriating and

condemning for a particular purpose the real measure of value, which is never allowable."

"In the same line," says the court in Conan v. City of Ely, 91 Minn. 127, 131, 97 N. W. 737, 739, after quoting from Boom Co. v. Patterson, supra, "this court has held that a person is entitled to the fair value of his property for any use to which it is adapted and for which it is available, and for which it may be sold. He is entitled to the value of his property for any use to which it may be applied, and for which it would ordinarily sell in the market, whether that use be one to which it is presently applied, or some other to which it is adapted. Any evidence is competent, and any fact proper to be considered, which legitimately bears upon the market value of the property."

After a careful review of the decisions of the Supreme Court of California on the subject, Mr. Justice Henshaw, in Sacramento Southern R. Co. v. Heilbron, 156 Cal. 408, 412, 104 Pac. 979, 981, thus concludes:

"It is seen, therefore, that this court by its latest utterances has definitely aligned itself with the great majority of the courts in holding that damages must be measured by the market value of the land at the time it was taken, that the test is not the value for a special purpose, but the fair market value of the land in view of all the purposes to which it is naturally adapted; that, therefore, while evidence that it is 'valuable' for this or that or another purpose may always be given and should be freely received, the value in terms of money, the price, which one or another witness may think the land would bring for this or that or the other specific purpose, is not admissible as an element in determining that market value, for such evidence opens wide the door to unlimited vagaries and speculations concerning problematical prices which might under possible contingencies be paid for the land, and distracts the mind of the jury from the single question—that of market value—the highest sum which the property is worth to persons generally, purchasing in the open market in consideration of the land's adaptability for any proven use."

The rule is quoted as authoritative by the Supreme Court of Idaho in Portneuf-Marsh Valley Irr. Co. v. Portneuf Irr. Co., 114 Pac. 19, 20, from the Supreme Court of Iowa (Ranck v. Cedar Rapids, 134 Iowa, 563, 111 N. W. 1027), as follows:

"Generally speaking, the true rule seems to be to permit the proof of all the varied elements of value; that is, all the facts which the owner would properly and naturally press upon the attention of a buyer to whom he is negotiating a sale, and all other facts which would naturally influence a person of ordinary prudence desiring to purchase. In this estimation the owner is entitled to have the jury informed of all the capabilities of the property, as to the business or use, if any, to which it has been devoted, and of any and every use to which it may reasonably be adapted or applied. And this rule includes the adaptation and value of the property for any legitimate purpose or business, even though it has never been so used, and the owner has no present intention to devote it to such use."

A like holding has been recently made by the Supreme Court of Washington. In re City of Seattle, 47 Wash. 603, 92 Pac. 423.

It is unnecessary to cite other authorities upon the subject, but it should be remarked that the rule in its broadest sense is especially applicable in a case where the property is so situated or conditioned as to have no current market value.

[2] It would seem that the testimony admitted, accompanied as it was by the careful admonition of the witnesses by the court respecting the exact question to be answered, was not objectionable under the rule. Many things were taken into consideration by the witnesses pertaining to the irrigation project of the plaintiff—the cost of the land to be utilized, cost of construction and maintenance, the feasibility of utilizing the water, the prospective amount available, the lands available for irrigation, the value of those lands, and the value of the water furnished, and perhaps anticipated profits, all entering into account as forming the basis for judgment as to the value of the land sought to be appropriated. In forming their estimates of value, the defendants were entitled to have the witnesses take into consideration the land "for the most advantageous use to which it may be applied." But it was not competent for them to place a value upon the land for any specific purpose as an independent fact. All the uses to which the property is available, the more advantageous as well as the less advantageous, should be taken into view, and the general estimate of the market value should be deduced; not what any one person would give for it for his particular use, but what could probably be obtained for it if a sale was desirable and a purchaser sought, applying the ordinary business methods for finding a purchaser and disposing of the property. That the witnesses were confined to an estimate of this sort is apparent from what the court said to the witness Wood:

"The question is, * * * in other words, whether the information which you have is sufficient to enable you intelligently to make an investment, and, if so, what would the business man who has the information which you have, or any man, pay in cash for that land. * * * We are trying to reach an intelligent estimate of the value of this land, not a mere guess, not a mere speculation, but * * * your best judgment, if you have any, as to what this property is worth."

This, together with the very careful and clear instructions given to the jury upon the subject of market value as the proper measure of damages, impels us to the firm conclusion that the jury could not have been misled as to the proper basis for forming their judgment as to market value, and that no error was committed in admitting the testimony complained of. It should be remarked that specific estimates of value pertaining to acquirement and construction of different parts of the irrigation project were brought out mainly by the cross-examination of the witnesses, but in the end the basis for estimate of the market value of the land was properly restricted.

[3] The next question presented is whether it was regular and proper to enter judgment in personam for the amount of the damages awarded. A condemnation proceeding is so largely statutory that it is of but little assistance to look beyond the state statute by which it is authorized. The statute of Idaho regulating the exercise of eminent domain (2 Idaho Revised Codes, pp. 326, 329–333) provides for instituting the proceeding to condemn by filing a complaint and issuing a summons. Section 5215. It prescribes what the complaint shall contain. Section 5216. The manner of issuing the summons and the form thereof. Section 5217. Also the manner of ascertaining and assess-

ing the value of the property by the court, jury, or referee. Section 5220. And then specifically that:

"For the purpose of assessing compensation and damages, the right thereto shall be deemed to have accrued at the date of the summons, and its actual value, at that date, shall be the measure of compensation for all property to be actually taken." Section 5221.

"The plaintiff must, within thirty days after final judgment, pay the sum of money assessed." Section 5223.

"Payment may be made to the defendants entitled thereto, or the money may be deposited in court for the defendants, and be distributed to those entitled thereto. If the money be not so paid or deposited, the defendants may have execution as in civil cases; and if the money cannot be made on execution, the court, upon a showing to that effect, must set aside and annul the entire proceedings, and restore possession of the property to the defendant, if possession has been taken by the plaintiff." Section 5224.

It would seem from a reading of these statutes in pari materia that, a jury trial having been had and assessment of compensation made, it is within the intendment thereof that the court should enter a personal judgment against the condemner. Payment of the sum of money assessed is required to be made within 30 days after the final judgment. If not so paid, the defendant is entitled to execution as in a civil action. He could have no execution without a judgment. Then, if the money cannot be made, the court may restore possession of the property. So the statute, not only speaks of the judgment, but treats of the subject with the especial thought that a judgment is essential. A reading of the entire statute on the subject of eminent domain gives assurance that the constitutional guaranty against the taking of private property without just compensation first ascertained and tendered has been reasonably safeguarded. Indeed, the Supreme Court of Idaho has so determined the question. Portneuf Irrigating Co. v. Budge, 16 Idaho, 116, 100 Pac. 1046. So that, the property owner being protected, it is not an insuperable objection that the condemner is not permitted to exercise his volition as to whether he will pay the assessment of compensation or abandon his project. The procedure is one for the Legislature, and, unless inimical to the fundamental law, it cannot be further questioned. We think the judgment in that particular was properly entered.

[4] The next contention is that the court erred in adding interest to the amount of the assessment from the date of the summons. Under the statute, the right to the compensation shall be deemed to have accrued at the date of the summons. Having such right to compensation at a given time, it would seem that the owner ought to have interest upon the amount ascertained until paid. In the meanwhile he can claim nothing for added improvements, nor is he entitled to any advance that might affect the value of the property. For authorities of some application, see Reed v. Chicago, M. & St. P. Ry. Co. (C. C.) 25 Fed. 886; St. Louis, E. R. & W. Ry. Co. v. Oliver, 17 Okl. 589, 87 Pac. 423; Warren v. St. Paul & Pacific Railroad Co., 21 Minn. 424.

These considerations lead to an affirmance of the judgment of the Circuit Court, and it is so ordered.