**McCANDLESS et ux. v. UNITED STATES.**
No. 6961.

Circuit Court of Appeals, Ninth Circuit.
Jan. 7, 1935.

Smith, Wild & Beebe and J. Russell Cades, all of Honolulu, T. H., for appellants.

William Stanley and George C. Sweeney, Asst. Attys. Gen., Charles B. Verner, Atty., Department of Justice, of Washington, D. C., and Sanford B. D. Wood, U. S. Atty., of Honolulu, T. H., for the United States.

Before GARRECHT, Circuit Judge, and NORCROSS, District Judge.

NORCROSS, District Judge.

A petition in condemnation was filed in the District Court for the District of Hawaii by the United States as petitioner against Lincoln L. McCandless and others, defendants, to acquire title to and possession of 4,080 acres of land in the Island of Oahu, Territory of Hawaii, for a naval ammunition depot, and for other public purposes and uses. The case was tried with a jury and verdict rendered fixing the value of the land at $206,563.51 and the value of the improvements at $14,000. A motion for a new trial was denied and judgment entered in accordance with the verdict. From the judgment and order denying said motion McCandless and wife appeal.

The land is situated in Lualualei Valley approximately 35 miles from Honolulu. The land of Oahu is 46 miles in length and 25 miles in width and is, roughly, divided by two approximately parallel ridges, Koolau Range, extending in length approximately 37 miles along the northeast or windward side of the Island, and the Waianae Range, extending about 18 miles along the southwest side of the Island. Lualualei Valley is the broadest coastal valley on Oahu, is rectangular in shape, and bounded on the eastern end by the Waianae Range, on the western end by the sea, and on the south by a mountain spur, separating it from the Nanakuli Valley, and on the north by a mountain spur separating it from the Waianae Valley. The land condemned is rectangular in shape and is situated in the eastern end of the Lualualei Valley, the western border being at the southern extremity, approximately 2½ miles from the sea. The tract extends about 3 miles across the valley and has a depth of about 2 miles.

The evidence submitted by petitioner and the defendant property owners respectively is voluminous and conflicting. Three witnesses on behalf of the petitioner testified that the land including improvements was worth $98,865, and one of the witnesses estimated the value of the improvements thereon to be about $15,400. Witnesses for defendants testified that the land was worth from $791,000 up to approximately $1,600,000. One witness testified that the cordwood alone on the land was worth $90,000. A witness for defendants testified the present depreciated value of the improvements is $126,918.71. There was also offered by petitioner and admitted in evidence over the objection and exception of defendants the tax return for the year 1930, verified by defendant L. L. McCandless, that "to the best of my knowledge and belief the full cash value" of the land in question is $15,162.

While there are twenty-three assignments of error, as stated in the brief of appellants, but three principal questions are presented by this appeal. They may be stated as follows:

(a) Whether the trial court under the circumstances of this case could exclude all or any of the evidence offered by the landowner to show that water was available in such a condition and location as to give the land a market value as potential sugar land.

(b) Whether the court erred in allowing the petitioner to introduce in evidence certain lease contracts of other lands claimed to be similarly situated to the land sought to be condemned.

(c) Whether the verdict of the jury, under a statutory requirement to make a "separate assessment" of the value of improvements, can be sustained where such "separate assessment" is not within the range of the testimony of witnesses as to the value of improvements.

The evidence is without conflict that the major portion of the land in question, 2,600

to 3,000 acres, was adaptable for the production of sugar cane providing there was an adequate water supply for irrigation. For illustration, Ernest Brecht, a witness on behalf of the petitioner, testified: "I live at Waianae on the Island of Oahu and now am and have been manager of the Waianae Plantation for the past eleven years. Waianae is the valley adjoining Lualualei. I have been connected with the cultivation of sugar cane for twenty-five years. The plantation has sugar cane lands makai (seaward) of the McCandless land. The soil in the valley is suitable for sugar cane but the water supply is limited. The McCandless ranch lands, which are the subject matter of this suit, at the time suit was started, were suitable for the cultivation of sugar cane except that there was a shortage of water. With sufficient water a portion of the land cultivated by Waianae Plantation is the best sugar cane land in the Territory of Hawaii and the land, which is the subject matter of this suit, is by and large as good cane land as there is in the Territory if there were water. There is good land in spots right up to the forest reserve, but above the three hundred foot contour line the land is much steeper than below the three hundred foot contour line. The Waianae Plantation is engaged in developing water at Waianae. If the land involved in this suit had water it would be 90% as good as the land of Ewa Plantation but it would require more water than Ewa Plantation."

The court limited the landowner in his showing of available water for irrigation purposes to the land itself and to the 289-acre tract on the Haleakala Ridge immediately adjoining the land, a portion of which tract was being condemned. The testimony was to the effect that on the 289-acre tract the maximum quantity of water that could be developed was from two million to three million gallons per day. Limited to the land itself for sources of water it was clear from the evidence that the land could not be made available for sugar cane purposes, since for this purpose twenty-five to thirty million gallons of water per day would be required.

An offer of proof was made upon the part of the landowners and denied, as follows:

"1. That any prospective purchaser of the tract of 4080 acres at Lualualei, Oahu, owned by respondent L. L. McCandless, and the subject of this suit, would at the time of the institution of this suit take into consideration the reasonableness of the possibility of securing a supply of water for this tract for the purpose of irrigating the same for the cultivation of sugar cane.

"2. * * * That the tract of land sought to be condemned is by reason of its area, location, soil and climatic conditions adapted to and suitable for the purposes of a sugar plantation if water is available. * * *

"3. That nearly all of the sugar cane lands in the Territory of Hawaii require the bringing of water from other lands to such cane lands for irrigation purposes, and that the availability of water for such purposes is a factor, and is by all persons familiar with cane cultivation considered a factor in determining the value of such cane lands. I am adding to that,—that such water is, in many instances, transported much greater distances than would be required in this case.

"4. That there are certain artesian basins or isopiestic areas located in the vicinity of Waipahu and Pearl City, Island of Oahu, on and from which there is now, and has been for many years last past, fresh artesian water unused and flowing to waste amounting to a minimum of approximately 60,000,-000 gallons per day.

"5. That respondent, L. L. McCandless at the institution of this suit owned, and still owns, in fee simple, lands in said isopiestic areas, and that said surplus or unused water can be recovered by sinking wells on his said lands, and that the recovery by him of said water would in no way interfere with any present use of or demand for such water; and that said wells would be located at distances of from 8 to 10½ miles from the 4080 acre tract of said respondent, and sought to be condemned in this suit.

"6. That at the time of the institution of this suit it was practicable and economically feasible to transport such surplus water from said lands of respondent L. L. McCandless to his said tract at Lualualei, and that the cost of recovering and transporting such water would render the use of such water economically feasible and profitable upon said tract at Lualualei, and that the possibility of such taking and use of such water was one that could at the time of the institution of this suit be anticipated with reasonable certainty.

"7. That at the time of the institution of this suit, the existence of said surplus water in the vicinity of Waipahu and Pearl City, and the fact that such water could be

captured and transported practicaly and economically to said land of respondent L. L. McCandless at Lualualei,—* * * and the fact that the same could be used profitably on said land in the cultivation of sugar cane, and the possibility of such recovery, transportation and use were so great that the same would have influenced the judgment of prospective purchasers of this said tract at Lualualei, and in the minds of such prospective purchasers, would have added to the value of such tract.

"8. That the cost of recovery on the lands of respondent, L. L. McCandless, in the vicinity of Waipahu and Pearl City, of sufficient water for the irrigation of this tract at Lualualei for cane cultivation, and the cost of transporting such water to said tract at Lualualei, would be less per million gallons than costs heretofore incurred for the recovery of and transportation of water to other cane land areas on the Island of Oahu and other islands in the Territory of Hawaii.

"9. That prior to the bringing of this suit, and for more than ten years last past, the respondent has been planning to develop said tract as a sugar plantation and using said water thereon, and that for some time, and more than five years prior to the beginning of this suit, said respondent began negotiations for the transportation and use of this water to and on his land.

"10. That there is available for sugar cultivation in connection with the said 4080 acre tract an additional area of 4000 acres for the purposes of cane cultivation, and that the available water could be used for the purposes of cultivating this additional 4000 acre tract."

A further offer of proof was made and denied respecting the testimony of the appellant L. L. McCandless as follows: "We offer to prove by this witness and by the others, in connection with the original offer of proof, supplemented by the answers of Mr. McCandless on the stand, that Mr. Mc-Candless has been for many years negotiating for the development of a sugar plantation on his land at Lualualei; that he knew of at least three sources of water supply, one the Ewa basin, so-called, where he owns approximately two thousand acres entitled to artesian water; second, the Waiahole water, so-called, which is owned by Mr. Mc-Candless in person, amounting to more than sixty million gallons a day, which could be transported through the Waiahole tunnel, but which would have to go over the Oahu

Sugar Company's land and over other lands of Mr. McCandless, and, third, by a tunnel under the ridge behind Mr. McCandless' land, going into the Robinson and Campbell Estate land at Hoaiai and Honouliuli, either of which sources would furnish ample water for Mr. McCandless' purposes in developing a sugar plantation, without injury to the use of the land by any one else, and that the negotiations have proceeded so far that Mr. McCandless had every reason to expect that within a short time, if it had not been for the intervention of this suit, this water would have been developed from either one of those three sources, and that he had been assured that the policy of the Land Commissioner, and all of the Land Board of the Territory, would be in favor of granting a license or a fee simple right of way, depending on the circumstances, to Mr. Mc-Candless, for the development of his plantation in connection with one of the three sources of water supply,—that is, as far as concerns the right of way over government land only."

Among instructions to the jury to which exception was taken was the following: "(12) In estimating the compensation to be paid to the owners of the land which the government here seeks to condemn, I instruct you that you must entirely disregard any possibility of bringing water to the land in question from any other land, excepting the land which the government here seeks to condemn and the 284 acre tract."

The major question upon the appeal is whether the court erred in denying the offers of proof and giving the instruction quoted.

The recent decision of the Supreme Court in the case of Olson v. United States, 292 U. S. 246, 254, 54 S. Ct. 704, 708, 78 L. Ed. 1236, recites at length the rules governing the scope of evidence admissible in condemnation suits. From the opinion in that case we quote:

"The judicial ascertainment of the amount that shall be paid to the owner of private property taken for public use through exertion of the sovereign power of eminent domain is always a matter of importance for, as said in Monongahela Navigation Co. v. United States, 148 U. S. 312, 324, 13 S. Ct. 622, 625, 37 L. Ed. 463: 'In any society the fullness and sufficiency of the securities which surround the individual in the use and enjoyment of his property constitute one of the most certain tests of the character and value of the government.'

The statement in that opinion (page 326 of 148 U. S., 13 S. Ct. 622, 626) that 'no private property shall be appropriated to public uses unless a full and exact equivalent for it be returned to the owner' aptly expresses the scope of the constitutional safeguard against the uncompensated taking or use of private property for public purposes. Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 399, 14 S. Ct. 1047, 38 L. Ed. 1014.

"That equivalent is the market value of the property at the time of the taking contemporaneously paid in money. Seaboard Air Line Ry. v. United States, 261 U. S. 299, 306, 43 S. Ct. 354, 67 L. Ed. 664; Jacobs v. United States, 290 U. S. 13, 17, 54 S. Ct. 26, 78 L. Ed. 142; 2 Lewis, Eminent Domain (3d Ed.) § 682, p. 1172. * * * He is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more. It is the property and not the cost of it that is safeguarded by state and Federal Constitutions. Minnesota Rate Cases, 230 U. S. 352, 454, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18.

"Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined. The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held. Mississippi & R. River Boom Co. v. Patterson, 98 U. S. 403, 408, 25 L. Ed. 206; Clark's Ferry Bridge Co. v. Public Service Comm., 291 U. S. 227, 54 S. Ct. 427, 78 L. Ed. 767; 2 Lewis, Eminent Domain (3d Ed.) § 707, p. 1233; 1 Nichols, Eminent Domain (2d Ed.) § 220, p. 671. The fact that the most profitable use of a parcel can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably sufficient to affect market value. * * *

"In respect of each item of property that value may be deemed to be the sum which, considering all the circumstances, could have been obtained for it; that is, the amount that in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy. In making that estimate there should be taken into account all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining. Brooks-Scanlon Corp. v. United States, 265 U. S. 106, 124, 44 S. Ct. 471, 68 L. Ed. 934. The determination is to be made in the light of all facts affecting the market value that are shown by the evidence taken in connection with those of such general notoriety as not to require proof. Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable should be excluded from consideration for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth. Cf. Minnesota Rate Cases, supra, page 452 of 230 U. S., 33 S. Ct. 729; Smith v. Illinois Bell Tel. Co., 282 U. S. 133, 152, 51 S. Ct. 65, 75 L. Ed. 255; Los Angeles Gas Co. v. Railroad Comm., 289 U. S. 287, 319, 53 S. Ct. 637, 77 L. Ed. 1180."

The following statement by this court in Weiser Valley Land & Water Co. v. Ryan, 190 F. 417, 421, is in accord with the views expressed by the Supreme Court in the Olson Case: "The proper basis of inquiry is, What were the lands worth in the market? And this establishes the measure of damages. In ascertaining such value, the property should be viewed, not merely with reference to the uses to which it is at the time applied, but with reference also to the uses to which it is manifestly adapted, taking into account its capability as well as its availability."

The court below held that in determining the market value of the land condemned the jury could take into consideration its productivity for various products, including sugar cane, requiring irrigation, but limiting consideration to such water supply as might be developed upon the land itself, and a certain 289-acre tract immediately adjoining the land in question. If land sought to be condemned is not at the time under cultivation but is reasonably susceptible to the production of various crops by available means of irrigation, that is a fact to be considered in determining the question of market value. Whether or no water is available

for irrigation of the particular tract does not depend entirely on the location of the source of supply. The only question in that respect is whether there is such a source of supply within such distance and location that the cost of delivery to the land would not be unreasonable. The offer to prove in this case included the fact of an ample water supply within eight or ten and a half miles of the land, "and that the cost of recovering and transporting such water would render the use of said water economically possible and profitable upon said tract." It is a matter of common knowledge that in the arid region water for irrigation of growing crops, less valuable than that of sugar cane, is transported even greater distances. The various reclamation projects established under the National Reclamation Law (43 USCA § 371 et seq.) will disclose many examples of the source of water supply being many miles distant from the land reclaimed. Where land is susceptible of producing valuable crops, providing water for necessary irrigation thereof is supplied thereto, the fact that a water supply is available, and at a reasonable cost may be conveyed thereto, may and should be taken into consideration in determining the market value of the land at the time of condemnation. The distance of the source of water supply from the land susceptible to reclamation is material only in so far as it affects the question whether the cost of diversion and transportation would justify such expense. Such cost is an element to be considered in determining the market value of the land in advance of reclamation.

■ It appears from the evidence that in order to supply the land in question with a sufficient water supply for the cultivation of sugar cane the water would have to be conducted not only across public lands of the Territory but also across other land held in private ownership. It may be assumed that such a right of way may be acquired over private lands by condemnation if necessary by means of a corporation organized for such a purpose. 48 USCA § 562; Rev. Laws Hawaii 1925, §§ 828, 829.

■ The offers of proof do not contain statements respecting proposed evidence as to the actual market value of the land when reclaimed for sugar cane production, or the reasonable cost of delivering an adequate water supply to the land for such purpose. The ultimate question of market value at the time suit was instituted could not exceed the difference between the value of the land re-

claimed and the cost of reclamation. We need not determine whether the offers should have specifically covered these ultimate questions of fact. No specific objection was interposed to the offers of proof that they did not cover such statements, and hence were too indefinite. A witness upon the part of petitioner had previously testified: "This land has been studied extensively for water supplies and there is no water available. * * * Any agricultural possibilities for this land would not affect a buyer considering the purchase of this land in January, 1930. * * * The possibility of getting water elsewhere on the land would be at prohibitive cost."

Another witness testified: "We considered the possibilities of developing water on the land or bringing water to the land in other places but did not consider that this could be done economically."

The denial of the offers of proof had the effect of submitting the case to the jury without opportunity to refute this testimony. The denial of the offers and the giving of the instruction above referred to were errors.

■ The question now for consideration is whether such errors were prejudicial. 28 USCA § 391. As before stated, the offers of proof did not state what such proof would show the value of the land to be when reclaimed for the purpose of production of sugar cane, nor the cost of developing and delivering a sufficient water supply. The crucial question is left entirely to speculation as to what would be the effect of the evidence offered, assuming it would establish the existence of a sufficient supply to be developed some eight or ten miles distant from the land to be reclaimed. With respect to the development of water on the 289-acre tract, a witness for appellants whose qualifications as an underground water expert were admitted, testified that he "concluded that two to two and a half million gallons of water per day could be developed by sinking a shaft to the vicinity of sea level, and driving a tunnel to the crest of the ridge. * * * The length of the tunnel would depend on where the shaft is sunk. If the shaft is sunk at the 100-foot contour the tunnel would be approximately 3375 feet long. If * * * at the 200-foot level the tunnel would be approximately 2250 feet." What may be the problems and the cost thereof in developing and delivering a water supply ten times greater than the amount referred to by the witness,

and conveying the same a distance of from eight to ten miles, is left entirely to speculation. The jury fixed the market value of the land at an amount more than twice the valuation placed thereon by witnesses for the government. We cannot say from the record that had the offers of proof been granted a showing would have been made justifying a larger verdict. The amendment to section 269 of the Judicial Code adopted February 26, 1919 (40 Stat. 1181) added an additional sentence which reads: "On the hearing of any appeal, certiorari, writ of error, or motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties." 28 USCA § 391.

As said in the note (185) to the section cited: "Under this section the former practice of holding an error reversible unless the opposite party can affirmatively demonstrate it was harmless is changed, and the burden now is on the complaining party to show from the record as a whole the denial of some substantial right." Among the cases cited are two from this court: Simpson v. U. S. (C. C. A.) 289 F. 188, certiorari denied 263 U. S. 707, 44 S. Ct. 35, 68 L. Ed. 517; Armstrong v. U. S. (C. C. A.) 16 F.(2d) 62, 65, certiorari denied 273 U. S. 766, 47 S. Ct. 571, 71 L. Ed. 881. See, also, Liberty Oil Co. v. Condon Nat. Bank, 260 U. S. 235, 245, 43 S. Ct. 118, 67 L. Ed. 232; Dimmitt v. Breakey (C. C. A.) 267 F. 792, certiorari denied 254 U. S. 641, 41 S. Ct. 13, 65 L. Ed. 453.

The offers of proof were not sufficiently specific to enable the court to say that their denial was prejudicial error. The same reasoning applies to the instruction.

It is further contended upon the part of appellants that the court erred in admitting in evidence three leases issued by the Commissioner of Public Lands of the Territory of Hawaii. Two of the leases cover land immediately west of the condemned land, these being leases Nos. 1263 and 1455. The third lease, No. 1851, is land on the Haleakala Ridge, which is the ridge to the east of the condemned land. Lease No. 1263 covers 513 acres of land which is described as sugar cane land. It was developed in the evidence that water for irrigating this tract comes by flume from the sugar plantation (Waianae Plantation) in the adjoining valley. The rental reserved is $10 per acre per year, the term running from January 31, 1921, for fifteen years. Lease No. 1455 covers 1,297 acres of pasture land, the rental reserved being 60 cents per acre per year, the term being fifteen years from August 10, 1922. Lease No. 1851 covers 2,320 acres of pasture land, the rental reserved being $1 per acre per year, the term running fifteen years from September 1, 1928. In each of these three leases there appear the following clauses:

"That the Lessee shall * * * pay and discharge, at its own cost and expense, all costs and charges for fencing the whole or any part of the above described premises, if such fencing shall be required by the Lessor * * *."

"That at any time or times during the term of this lease, the land demised, or any part or parts thereof, may at the option of the lessor, * * * be withdrawn from the operation of this lease for homestead or settlement purposes, or for storing, conserving, transporting and conveying water for any purpose, or for reclamation purposes, or for forestry purposes, * * * or for any public purpose, or for sale for any purpose for which land may be sold under the provision of Section 73 of the Hawaiian Organic Act as now or hereafter amended, and possession resumed by the Lessor, * * *." See 48 USCA § 665.

One of the witnesses for the petitioner testified: "In estimating my value I capitalized the rentals paid for near by pastural lands and made allowance for the fact that such lands were under government leases." Another witness testified: "I have studied leases in the neighborhood and capitalizing these on the basis of the rental recited therein have used the information in connection with my estimate of value of the McCandless lands." Another witness testified: "I considered leases and sales of ranch land situated everywhere in the Territory about which I was informed in making up my valuation of this land." A fourth witness testified: "I figured that the rental reserved in nearby governmental leases was a fair criterion of the value of this land."

It is clear from the testimony of the witnesses upon the part of the petitioner that their estimate of the market value of the land condemned was based largely if not entirely on the leases referred to.

In the brief of appellee appears the statement: "These lease contracts were not introduced in evidence for the purpose of definitely and conclusively fixing the basis up-

on and from which the value of the property should be estimated, but as a circumstance to which the jury could look for the purpose of reaching what the market value of the property was in January, 1930, when the proceedings to appropriate it were instituted."

The general rule in condemnation proceedings is that evidence of the rental value of other lands in the vicinity is inadmissible. Pullman Co. v. Chicago, 224 Ill. 248, 79 N. E. 572; 20 C. J. 987. The following authorities also support the general rule: Schradsky v. Stimson (C. C. A.) 76 F. 730; Tennessee C., I. & R. Co. v. State, 141 Ala. 103, 37 So. 433; Jamieson v. King's County El. Ry. Co., 147 N. Y. 322, 41 N. E. 693.

In view of the fact that it is manifest that the jury did not base its verdict on the leases or the testimony of petitioner's witnesses based thereon, but upon the contrary returned a verdict more than double the amount of the estimate of these witnesses, it does not appear that the landowners were prejudiced by the admission of the leases in evidence.

 It is contended that the verdict of the jury determining the value of the improvements does not come within the range of the testimony, hence the verdict should have been set aside and a new trial granted. The law of the Territory of Hawaii requires that in a condemnation suit the jury must assess the value of the improvements separate and apart from the land. The verdict in this case fixed the value of the improvements at $14,000.

In the brief of appellants appears the statement: "It is apparent from the evidence under any theory the minimum value of the improvements was $15,400, and hence in rendering its verdict for $14,000, the jury disregarded the evidence entirely, acted on prejudice and passion, and that there is no hypothesis of fact upon which this verdict can be justified."

As upon other questions of fact, there was a wide difference in the testimony of a witness for petitioner and a witness for the landowners respecting the value of the improvements. Only one witness for each of the respective parties testified concerning such value. It may be said, however, with respect to the testimony of Stanley Livingston, petitioner's witness, that he testified that he was one of a committee of appraisers and that the report of the committee was unanimous. The others comprising the said committee testified respecting the value of the land including improvements to be $98,865. They were not examined respecting the value placed on the improvements. Mr. Livingston testified that the value placed upon the improvements was $15,400, which is an amount 10 per cent. higher than that placed by the jury. Mr. Livingston placed no separate valuation upon the several items constituting the improvements, such as buildings, stone walls, fences, pipe line, etc. He did, however, testify: "My figure on the pipe line was five thousand dollars, more or less." The present value placed by the witness for the landowners upon the pipe lines was $7,373.10. This witness also placed a present value of $91,700 on the "loose" stone walls. Concerning the stone walls Mr. Livingston testified: "I had no method of determining definitely the value of construction of stone walls. I considered them largely as incidental to the clearing of the land, and as taking the place, in some measure, of what might have been other necessary fencing in the development of the lands as they are used. * * *"

The transcript of the record on appeal contains the following recital: "Be It Remembered that on December 10th, 1930, by stipulation of the parties to the cause, the jury left the courtroom and was conducted in a body by the bailiff to view the land involved in this suit; that during the visit to the land said jurors were driven about on said land from place to place by automobile for the purpose of examining the land and improvements, but the jurors did not see all of the improvements, in particular, they did not see the concrete-rubble masonry reservoir, the concrete culvert and certain other improvements on Lot 1."

In addition to the testimony of the two witnesses, there was also in evidence the verified tax return made by the owner Mr. McCandless from which it appears that the only return made in respect to improvements was on lot 2 and the valuation placed at $1,000. Relative to this tax return the landowner testified: "In making my tax return the actual paper was made out by the Tax Assessor and I signed it under oath. The land is returned at $4.00 an acre and the improvements at $1000.00 for purpose of taxation. * * * In making my tax return my idea was that I did not want to pay any more taxes than I could possibly help for what I was doing with the land at the time. I was holding the land for future development." While objection was made and exception taken to the admission of this tax

return, it has not been contended upon appeal that such admission was error. The tax return was admissible. Roche v. Commissioner (C. C. A.) 63 F.(2d) 623; United States v. First Nat. Bank (D. C.) 250 F. 299; Franklin County v. Bailey, 250 Ky. 528, 63 S.W.(2d) 622; Welton v. Iowa State Highway Comm., 211 Iowa, 625, 233 N. W. 876; Brackett v. Commonwealth, 223 Mass. 119, 111 N. E. 1036, Ann. Cas. 1918B, 863; 22 C. J. 305. While the weight to be given to such tax return in determining market value may not be great, it was evidence which the jury could consider. The question here is whether the court should have granted a new trial because the jury reduced by 10 per cent., $1,400, the valuation of the improvements placed thereon by petitioner's witnesses. We think it cannot be said in view of all the evidence which the jury could consider, including the tax return, that the court erred in this respect.

Judgment affirmed.